**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **GEODATA SYSTEMS MANAGEMENT, INC.**<br>**7010 PEARL ROAD**<br>**CLEVELAND, OHIO 44130** | ) ) ) ) ) | **CASE NO.:** |
| **Plaintiff,** | ) ) | **JUDGE** |
| **v.** | ) ) ) | **(JURY DEMAND ENDORSED HEREON)** |
| **AMERICAN PACIFIC PLASTIC**<br>**FABRICATORS, INC**<br>**c/o DWIGHT LAW GROUP**<br>**2020 MAIN ST., SUITE 600**<br>**IRVING, CA  92614** | ) ) ) ) ) ) | |
| **and** | ) ) | |
| **TONY HOCHSCHILD, PRESIDENT**<br>**AMERICAN PACIFIC PLASTIC**<br>**FABRICATORS, INC**<br>**c/o DWIGHT LAW GROUP**<br>**2020 MAIN ST., SUITE 600**<br>**IRVING, CA  92614** | ) ) ) ) ) ) ) | |
| **and** | ) ) ) ) ) ) | |

**and**                                                )
                                                       )
**AMERICAN POLY VINYL**                                )
**COPRORATION**                                        )
**c/o DWIGHT LAW GROUP**                               )
**2020 MAIN ST., SUITE 600**                           )
**IRVING, CA  92614**                                  )
                                                       )
**and**                                                )
                                                       )
**HY ZORNES,**                                         )
**FORMER PRESIDENT**                                   )
**AMERICAN POLY VINYL**                                )
**COPRORATION**                                        )
**c/o DWIGHT LAW GROUP**                               )
**2020 MAIN ST., SUITE 600**                           )
**IRVING, CA  92614**                                  )
                                                       )
    **Defendants.**                )

---

## COMPLAINT

---

The Plaintiff, GeoData Systems Management, Inc. ("GeoData" or "Plaintiff") for its Complaint against the Defendants avers as follows:

### PARTIES

1.     Plaintiff GeoData Systems Management, Inc. is a corporation organized under the laws of Ohio with its principle place of business in Cuyahoga County, Ohio.  It does business throughout the world

2.     All the Defendants both individually and entity level are, upon information and belief, California individuals and companies who have used the address of Attorney Amanda Dwight for their legal address in other proceedings and, therefore, the Plaintiff's position is that they can be reached at that address for this suit.

**JURISDICTION AND VENUE**

3.     This Court has subject matter jurisdiction over GeoData's claims pursuant to 28 U.S.C. §§ 1331, 1338 and 15 U.S.C. § 1121 to the extent those claims arise under 15 U.S.C. § 1141(1), 1125(a).

4.     This Court has supplemental jurisdiction under and pursuant to 28 U.S.C. § 1367 over the supplemental and related state claims.

5.     This Court has jurisdiction over the remaining claims under and pursuant to 28 U.S.C. § 1338 because diversity exists and the amount in controversy, exclusive of interest and costs exceeds $75,000.

6.     Venue is proper in the Northern District of Ohio pursuant to 28 U.S.C. § 1391 as these Defendants did business in this judicial district, are therefore found in this District for venue purposes and a substantial part of the events giving rise to the claims alleged in this Complaint occurred in this District and/or the infringement and/or dilution occurred in this Judicial District. Additionally, the damages and injuries to GeoData from the misuse as alleged occurred in Cuyahoga County, Ohio where GeoData is located.

7.     This action should be assigned to the Eastern District of the Northern District because all or a substantial part of the events giving rise to the claims alleged occurred in Cuyahoga County pursuant to 3.8 of the Local Rules of the Northern District of Ohio.

**FACTS COMMON TO ALL COUNTS**

8.     In 1997 Bruce Jackim, on behalf of GeoData, was asked by LCDR Abdul Rahman Bin Ahmad (Rahman) to locate the manufacturer of some very large vinyl balloons once used by him years before for naval gunnery practice in Malaysia.  Rahman, an officer in the Royal

Malaysian Navy (RMN) had been a student of Mr. Jackim's at FITCPAC in Sand Diego, CA and the RMN liaison to the Prime Minister of Malaysia.

9.      Mr. Jackim attempted to track down the balloon's original source, which Mr. Jackim was lead to believe was Mr. Charles Hightower, who claimed he had tried to develop such a naval target many years before.  Mr. Jackim spoke with him regarding Malaysia's request.  It has since been determined that the original source for the plain cube "Surface Target Balloon RADAR Sensitive" target was a US Navy, Bureau of Ships document BUSHIPS No. 632-A-SK588 dtd 11/4/69.  Mr. Jackim sought out active duty naval personnel who had experience with that target, and confirmed that target did indeed not work and had been abandoned.

10.      Mr. Hightower explained that the targets did not work then and therefore had not been made for many years.  Nonetheless, Mr. Hightower put Mr. Jackim in contact with his then son-in-law, Hy Zornes, who was running the family business which used old welding machines necessary for the making of the targets.  They first spoke on July 22, 1997.

11.      At first, Mr. Zornes was not interested in producing any targets whatsoever.  His business at the time was making soft-side luggage for wholesalers.  But, with some further discussion and persuasion and the fact that Malaysia was willing to spend over twenty-five thousand dollars ($25,000.00) for some large quantity of targets, he agreed to make the targets for Mr. Jackim at GeoData.

12.      On October 9, 1997, American Polyvinyl Corporation (APV) was paid ten-thousand dollars ($10,000.00) U.S. currency to commence new production of a 10x10x10 foot large international orange inflatable polyvinyl cube target balloon.

13.      These targets were finished in three (3) months and on December 10, 1997 Rahman and Mohd Dise bin Mohd Som (Dise), Managing Director, Platiform (M) Sdn. Bhd. (Platiform)

and Mr. Jackim met with Hy Zornes at APV, which at the time was located at 26820 Hoble Circle, Muretta, California to inspect the targets that had been created, to pay APV for the remaining amounts due at the time, which was fourteen-thousand two-hundred eighty-five dollars ($14,285.00) for one hundred ten (110) targets, stacked folded flat about forty inches (40") high and five (5) pallets.

14.    During that December 10, 1997 meeting in California, Mr. Zornes gave away samples of some of the small bags they had made from their usual production of soft-sided luggage and he also had one of his people repair Mr. Jackim's canvas briefcase which had suffered some damage during the trip.  The factory at the time contained a business office area, some storage and large production spaces filled with heavy duty industrial type sewing machines, nylon canvas bags in several colors, sizes and shapes, and while they were waiting they were admiring Mr. Zornes using his own private climbing wall because he was an avid rock climber.  The facility had no evidence of RF welding machines, layout tables, polyvinyl material or equipment to handle large rolls of polyvinyl.

15.    While Mr. Zornes was attending to fixing Mr. Jackim's briefcase, Mr. Jackim joked that if we inflated all these targets at the same time and turned them loose in the Straits of Malacca, it would seem as if Malaysia were being invaded by "giant tomatoes."  Everyone laughed.  Then, Rahman joked that US President Carter had been attacked by a "killer rabbit," therefore, the original joke was modified into an invasion by "giant killer tomatoes."  Everyone continued to laugh.  As Mr. Zornes returned, he overheard the laughter and asked about the joke.  Mr. Zornes did not understand the joke.  No one knew anything about any possible reference to a movie and the only name used by anyone for these targets was simply "target balloons."

16.     Thereafter, Mr. Jackim asked Mr. Zornes for contact information to previous end users for purposes of him determining how to best redesign the old targets for better functioning. He could not provide Mr. Jackim any references.  Eventually, Mr. Jackim found persons at the U.S. Navy, the U.S. Coast Guard, and the Canadian Navy.  Specifically, two (2) persons, one a Chief of the Coast Guard and the other a Lt. Commander in the Canadian Navy in Vancouver, BC, Canada, were very helpful in describing to Mr. Jackim the problems with the old balloon target.

17.     As a result of these conversations, Mr. Jackim learned that the targets had been prone to bursting open, to rolling over in the waves, the sea anchors did not work, and they never succeeded in returning a radar signal despite that being the original purpose of using these for different functionalities.

18.     Mr. Jackim told Mr. Zornes that he wanted to add a skirt to one side of the target to fill with water to prevent rollover by stabilizing one side as down.  No progress was made with Hy Zornes at the time and GeoData never got to build the skirt or to improve the radar reflection.  Mr. Jackim spoke with Hy Zornes in July 2001 when Eire wished to purchase NavTGTs and Malaysia wanted some additional twenty (20) NavTGTs.   Mr. Zornes changed GeoData's cost to five-hundred seventy-five dollars ($575.00) each, resulting in cancellation of sales.  Thereafter, Mr. Jackim was informed that APV sold everything related to production of target balloons to American Pacific Plastic Fabricators (APPF) and then was introduced to Mr. Tony Hochschild.  Mr. Jackim first contacted Mr. Hochschild on December 4, 2001.

19.     Although initially Mr. Jackim was elated that APPF could keep up with the requirements of GeoData in selling these giant tomato targets, Mr. Jackim was very disappointed and almost distressful of the fact that he learned sometime thereafter that APPF had taken out a U.S. patent on the Drogue Shoot, which Mr. Jackim had shown to Mr. Zornes by both conversation

and design and Mr. Jackim had no idea that these designs had been given to Mr. Hochschild allegedly as part of the asset deal.

20.     Moreover, both Mr. Zornes and Mr. Hochschild discussed improvements to the radar reflector several times including placement of Mylar patches, fold out reflectors and solid corner reflectors for the top of the target, which were later also incorporated into APPF's U.S. patent application, which at the time was not known to Mr. Jackim or GeoData.

21.     During all of the time with APV no one referred to the target balloons as "killer tomato" except LCDR Rahman in reference to the joke.  In further conversations with previous end users, with new potential end users in the U.S. Navy, U.S. Coast Guard, Royal Malaysia Navy and other countries, Mr. Jackim, for GeoData, had to explain the unprofessional sounding inside joke about the movie reference to the 'Killer Tomato,' but it tended to catch on even though these giant naval targets, frankly, did not look like tomatoes.

22.     By 2005 it had become a recognizable trade name that people easily remembered when they were looking for naval targets, and by 2007 GeoData made 'Killer Tomato' an official trademark for the improved naval target.  And, GeoData also designed new alternative naval targets beginning in 2005 but continued the trade name venue with  'Killer Karrott,' 'Killer Lemon,' 'Killer Banana,' 'Target X-Ray,' 'Bogie Blimp,' and also 'Killer Orange.'

23.     At no time prior to APPF sending GeoData the purported APV surface target balloon radar enhanced Pdf data sheet (AAA123.pdf) had Mr. Jackim seen any reference from APV bearing the name "The Killer Tomato".  The document sent to Mr. Jackim did not contain any copyright print marks or date of creation that Mr. Jackim could see and he found it extremely curious that in all of the years he had been working with Mr. Zornes that he had never seen that data sheet before.

24.     Mr. Hochschild claimed that the term 'Killer Tomato' had been in the public domain since the early 1980's, which we disagree with.  Mr. Jackim is retired from military service and in all of his years in the U.S. Navy since 1979 until retirement in 1992, and including his wife's two decades of service in the U.S. Navy, they never once heard anybody refer to a target balloon as a "tomato" target.

25.     Nina Jackim was a naval officer from 1980 to 1994, and has confirmed the same.

26.     The Jackim's retired U.S. Navy' friends of over thirty years have also confirmed this.

27.     Mr. Jackim was a naval intelligence officer assigned to the USS Enterprise assigned to its air wing.  He was responsible for planning air and sea operations, training and operational reports.  He was directly involved in numerous live-fire exercises over several years and was responsible to score the accuracy of the live-fire.

28.     In all of his positions and Nina Jackim's positions, they were involved in operations of a great many ships and aircraft all over the Pacific and Indian oceans.  Nina was also in San Diego assigned to the Operational Test and Evaluation Force, Pacific from 1982 through 1985. This command was in charge of testing all types of targets and missile systems used by the U.S. Navy.

29.     Neither one of them, during this time, had ever heard of a "tomato" target balloon anywhere in the world and they were in positions to know if such a thing were being used.  In fact, they both would have loved to have such a great target balloon available during their years of active service to the military.  Had any such target been available at that time, they would have known of such.  Therefore, both Mr. and Mrs. Jackim know from personal experience and knowledge that the vinyl target balloon was not in general use by the U.S. Navy during the time of 1979 – 1994.

This direct personal knowledge cannot be disputed, and the naval gunnery target term "Killer Tomato" only came into being on or after 1997.

30.     After establishing the trade mark names, GeoData had the names recorded with the U.S. Navy Procurement and Operational Systems, linked to the GeoData CCR registrations and GeoData is the recorded sole-source provider, or should have been, originator, design holder, proprietary owner and recognized for all of these trademarks as NavTGT.

31.     With regard to specifically the term "Killer Tomato" the trademark NavTGT is recorded in the weapon's systems manual such as the Navy Cherry Point Range Complex (CherryPT.pdf), provided by GeoData Systems Management, Inc.

32.     Moreover, the name GeoData trademarks are valid, recorded and recognized.  They have been as such for more than a decade and GeoData and their owners have spent a considerable amount of time establishing their name-brand recognition and worked hard to protect against counterfeit products, infringements and inappropriate practices, by procurement personnel including Philadelphia DLA.

33.     Mr. Jackim and GeoData maintain that the name "Killer Tomato" is not just recognized with the U.S. Navy, but in navy's world wide as a result of GeoData's efforts to sell these products world wide.

34.     On September 20, 2007, GeoData sold and delivered fifteen (15) NavTGTs to Port Hueneme.  Thereafter, unbeknownst to GeoData at the time, Port Hueneme contacted APPF directly for all further orders.  That should never have happened.  In June of 2012, GeoData discovered that sales of "Killer Tomato" targets started with GeoData as the sole source, but were ultimately paid to and delivered direct to clients by APPF.  Additional such misdirected sales now documented include USS Gettysburg, USS Frank Cable, USS Lake Champlain and others.

35.     Unfortunately, what APPF is doing and claiming to be able to do is take the business GeoData began with Hy Zornes, which Hy Zornes sold apparently to APPF by an asset sale which had nothing to do with GeoData and both create and market these giant tomato targets to navies around the world directly without using GeoData because they claim to own the design from Hy Zornes, they have gone ahead and tried to file patents and trademarks on the information when they know full well that it came from GeoData and we are before the Patent and Trademark Office on a trademark issue that directly arises from all of these concerns.

## COUNT ONE
## Federal Unfair Competition (15 USC Sec. 1125 *et seq.*)

36.     The Plaintiff reincorporates all of its allegations contained in Paragraph 1 through 35 of the Complaint as if fully restated herein.

37.     Defendants have held themselves out to own certain intellectual property rights in GeoData's "Killer Tomato" target balloons.   The Defendants took over assets from Chuck Hightower and Hy Zornes at APV, which information we have not been shown.  Then Defendants inappropriately filed for a U.S. patent using information that Hy Zornes had no business providing to APPF.   Further, Defendants registered trademarks for the term "Killer Tomato" without GeoData's permission or knowledge, diverted sales from GeoData that they knew belonged to GeoData and filled the orders without even referencing to GeoData.  The conduct and assertions by Defendants constitute false representation as to sponsorship, endorsement, authorization, assignment and affiliation from the creator and owner of the intellectual property which is GeoData and Bruce Jackim.

38.     Such actions have misrepresented the nature, characteristics and qualities of GeoData's goods and/or commercial activities in the marketplace.

39.     As such, the Defendants are in violation of Section 43(a) of the Lanham Act, 15 USC §1125 *et seq.*

40.     As a direct and consequential result of Defendants' unlawful misconduct, GeoData has suffered and will continue to suffer substantial monetary losses, including loss of good will and intangible irreparable injury to its reputation and its business.

41.     The Defendants, unless enjoined by this Court, fully intend to continue its wrongful conduct passing off GeoData's intellectual property as its own without payment or compensation.

42.     As a direct and consequential result of Defendants' willful and intentional misconduct, GeoData is entitled to injunctive relief as well as actual damages in amounts to be determined at trial, but no less than the actual total amount of GeoData's loss of profits from current and past wrongful conduct, punitive and treble damages, statutory damages, interest, attorney's fees and costs.

## COUNT TWO
### Trade Lible

43.     The Plaintiff reincorporates all of its allegations contained in Paragraph 1 through 42 of the Complaint as if fully restated herein.

44.     The Plaintiff asserts that Defendants intentionally committed trade lible against GeoData under Ohio Common Law.

45.     The Defendants' statements that GeoData has no business concerning itself with the "Killer Tomato" name, by getting Finletter involved as a third-party into this action to divert the true misconduct of their ways and by telling GeoData's customers and potential customers that they falsely own the intellectual property related to the "Killer Tomato", they have disparaged the

quality of GeoData's good will and products, their brand name, their reputation in the market place and of course diverted unknown number of sales at this point.

46.     By falsely claiming that they have the exclusive right to distribute GeoData's "Killer Tomato" target balloons around the world, the Defendants have in writing, published, expressed and communicated false, malicious, defamatory, and disparaging words that: 1) tend to injure GeoData's business reputation and those of its officers and employees; 2) made charges against GeoData, its employees, agents and officers in reference to false origin of intellectual property calculated to injure further GeoData's product lines; and 3) these false statements of commercial origin or commercial disparagement have created special damages to GeoData due to the very nature of the allegations themselves.

47.     At the time the Defendants published to anyone who would listen their commercially defamatory statements, the Defendants knew or should have known that these statements were false, misleading and at a minimum in controversy considering the origin of the statements.

48.     Therefore, the Defendants' actions and statements were maliciously willful, oppressive, fraudulent without justifiable right and certainly without a court order and taken for the sole purpose of damaging GeoData.

49.     As a direct and consequential result of Defendants' willful and intentional misconduct, GeoData is entitled to an amount of damages to be determined at trial but not less than those damages necessary to place GeoData back into a position of proper commercial standing throughout all of the years that APPF and it predecessors and officers and employees have maligned GeoData's efforts to have its "Killer Tomato's" marketed world wide.

## COUNT THREE
### Claim for Declaratory Judgment

50. The Plaintiff reincorporates all of its allegations contained in Paragraph 1 through 49 of the Complaint as if fully restated herein.

51. This Court has the power pursuant to U.S.C. § 2201(a) to declare the legal rights and obligations of any interested party seeking such declaration, regardless of whether further relief is or could be sought.  Specifically, this Court has the power to determine questions of contact interpretations, construction of validity, including the question of whether Hy Zornes of APV could have contracted to sell the assets of GeoData to APPF thereby disallowing APPF's right to do anything with the information other than to continue building what GeoData requested of it.

52. A real and justiciable controversy exists between GeoData and APPF requiring the Court to interpret the parties' contract rights and declare the obligations and rights of the parties with respect to GeoData's intellectual property.  Without restating all of the facts common to all counts, GeoData had APV produce target balloons that were orange.  Hy Zones was given access to GeoData's intellectual property including designs of improvement on the balloons and naming of the balloons for GeoData's customers and marketplace.  Hy Zornes and APV were never given the right to take this information and create their own market, which is apparently what they did by selling it to APPF.

53. APPF went off and created its own alleged intellectual property rights including a patent and a trademark which was not sent to GeoData for obvious reasons at the time it was done and then started creating these and diverting sales that GeoData should have made, to its own production facilities unbeknownst to GeoData who only found out about this years later indirectly

by finding out that governments and military establishments that would have been coming to them were actually getting them from APPF directly and cutting them out of their market.

54.     GeoData did not agree to sell its designs, its modifications, improvements, it creations to APPF or for that matter, APV. Neither one of them should have been entitled to take this information and create their own market with it. But, that is exactly what they did and they hid this from GeoData until it was finally discovered. GeoData did not consent to the creation of a marketplace competitor like APPF and the fact that they decided to go off and create their own market allegedly on the assets they purchased is ridiculous because they were not even in the business of doing this until GeoData used them to create and sell these target balloons including the "Killer Tomato" balloons to other countries and militaries.

55.     GeoData has the right to advance its defenses and claims in a court of competent jurisdiction and has a right to trial by jury. GeoData did not knowingly, voluntarily or intentionally agree to waive any rights by any agreement with any of the Defendants.

56.     GeoData is entitled to a declaration that there was no binding agreement with APV or APPF concerning the creation intellectual property rights with either one of these organizations and that they are taking these rights and making a market for themselves on the back of GeoData's efforts was a theft of intellectual property that we have now uncovered and need to bring to a court for interpretation, guidance and orders.

57.     Immediate and speedy relief is necessary to prevent the Defendants from proceeding with their continued efforts to take and misuse the intellectual property of the Plaintiff.

**COUNT FOUR**
**Lanham Act § 43(a), 15 U.S.C. § 1125(a)**

58.     The Plaintiff reincorporates all of its allegations contained in Paragraph 1 through 57 of the Complaint as if fully restated herein.

59.    The confusion, mistake or deception referred to in the Complaint arises out the aforesaid acts of Defendant or Defendants which constitutes false designation of origin, common law trade infringement and/or unfair competition in violation of § 43(a) of the Trademark Act of 1946, as amended, 15 U.S.C. § 1125(a).

**COUNT FIVE**
**Misappropriation of Trade Secrets Under**
**Ohio Revised Code §1333.61 *et seq*. against all Defendants**

60.    The Plaintiff reincorporates all of his allegations contained in Paragraph 1 through 59 of the Complaint as if fully restated herein.

61.    Defendants, through improper means, have misappropriated and are using GeoData's confidential and proprietary information, which are trade secrets under Ohio Revised Code Section 1333.61(D), including but not limited to all of the information regarding the "Killer Tomato" product, its applications, its customers, it improvements, its problems and issues and everything else relating to it.

62.    These trade secrets have independent and economic value, both actual and potential, are not generally known to and are not readily ascertainable by other persons who could obtain or derive economic value from their disclosure or use of such trade secrets.  Obviously, the Defendants have become competitors and are using the confidential and proprietary information without having incurred the cost and time that GeoData took for research, development and creation of a market.

63.    GeoData's intellectual property and financial information, pricing and cost information, and all of the rest are neither publicly disseminated nor public knowledge.

64.     GeoData uses reasonable efforts to maintain the secrecy and confidentiality of such trade secrets by implementing policies and practices governing the use and restriction of such disclosure.

65.     Defendants willfully, maliciously, and surreptitiously through improper means in an alleged asset deal, misappropriated GeoData's trade secrets in violation of Ohio Revised Code Section 1333.61 et sic.  Furthermore, the Defendants obtained and used GeoData's trade secrets without its expressed nor implied consent and, with the full knowledge that such trade secrets were acquired by improper means and further knowledge that such trade secrets were acquired by APV under the circumstances giving rise to a duty of confidentiality, duty of loyalty and fiduciary duty which Hy Zornes and Tony Hochschild breached.

66.     Defendants are, and intend to use GeoData's trade secrets for their own benefit and the detriment of GeoData.

67.     Defendants' misappropriation of GeoData's trade secrets has caused and will continue to cause GeoData irreparable harm for which there is no adequate remedy of law unless enjoined.

## COUNT SIX
### Tortious Interference of Business Relationships/Business Expectancy and Prospective Advantage

68.     The Plaintiff reincorporates all of its allegations contained in Paragraph 1 through 67 of the Complaint as if fully restated herein.

69.     Defendants have knowingly, willfully, and without privilege interfered with and continue to interfere with the existing and prospective relationships between GeoData and all of the potential militaries with whom it is, has and was doing business around the world.  This interference includes using GeoData's confidential and proprietary information about military

targets and other information relating to this without GeoData's consent and competing with GeoData in both Ohio as well as around the world.   Furthermore, Defendants' wrongful misconduct includes suppression from the militaries that GeoData was the proper representative from whom to buy the target balloons, misrepresenting its own intellectual property standing with militaries and governments around the world to sell them the target balloons directly, knowing that the orders were supposed to be going to GeoData, and in general misappropriating opportunities they knew full well should have gone to GeoData, but for this brazen theft of opportunities.

70.     The Defendants' interference damaged relationships between GeoData and its past and current customers and interest around the world.

71.     The Defendants' interference was and is improper and without justification. Furthermore, it was deliberate, willful, malicious, wanton and intentional injury to GeoData's trade, business and commercial activities.

72.     As a result of Defendants' tortious interference with current prospective business relations in the marketplace, GeoData has suffered damages and continues to be threatened with imminent and continuing irreparable harm in the marketplace from these efforts.

**COUNT SEVEN**
**Common Law Unfair Competition**

73.     The Plaintiff reincorporates all of its allegations contained in Paragraph 1 through 72 of the Complaint as if fully restated herein.

74.     The Defendants' use of GeoData's confidential and proprietary information including its customer list to sell target balloons of all sorts including the "Killer Tomato" target constitutes unfair competition under the Common Law of Ohio and California.

75.     Furthermore, Defendants concealed from GeoData that they were doing this, did not tell GeoData that APV was selling the assets that included the GeoData's rights in this

intellectual property to APPF and APPF not telling GeoData that it was going to be trying to get a patent and trademarks on property that they had no business getting intellectual property rights on or trying to get intellectual property rights on which constitutes unfair competition under the Common Law in both California and Ohio.

76.     Because of the Defendants' unfair competition the Plaintiff, GeoData has been irreparably harmed and damaged unless enjoined GeoData will suffer irreparable harm from which it has no remedy at law.

## COUNT EIGHT
### Breach of Contract

77.     The Plaintiff reincorporates all of its allegations contained in Paragraph 1 through 76 of the Complaint as if fully restated herein.

78.     GeoData had a valid enforceable and/or implied/oral contract with APV for the production of orange targets also known as "Killer Tomato" targets as well as the intellectual property and customer information concerning the sale of these targets to militaries around the world.

79.     Unfortunately, the Defendants have engaged in unfair competition against GeoData by and through the use and dissemination of GeoData's confidential information and trade secrets without GeoData's knowledge, consent or payment to GeoData.  APV alleged asset deal which we have not been privy to and other alleged sale of information to APPF which is not an arms-length transaction because it supposedly gave Tony Hochschild the right to try and file to the disadvantage of GeoData certain intellectual property rights he did not have a right to file for and to take advantage of these rights in the market place when cutting out GeoData was apparently the only reason for any of this as far as we can tell at this time.

80.     As a direct and proximate result of APV and APPF's breach of its implied and oral contracts with GeoData, GeoData has been damaged in an amount to be determined at trial.

**COUNT NINE**
**Breach of Fiduciary Duties**

81.     The Plaintiff reincorporates all of its allegations contained in Paragraph 1 through 80 of the Complaint as if fully restated herein.

82.     Both Hy Zornes and Tony Hochschild had fiduciary duties to GeoData both directly and by succession to conduct themselves with the utmost fidelity to GeoData and to subordinate their private and personal interest to GeoData in this situation and to refrain from acting in a manner adverse to GeoData's interest considering that APV had no target making interest until GeoData brought them the work.  Similarly, as agents of GeoData, they had a fiduciary duty of loyalty, good faith and fair dealing to GeoData, it principals and agents.

83.     Upon information and belief, Hy Zornes continues to receive royalties from or payments from APPF that result from the intellectual property he improperly sold of GeoData's to APPF.

84.     APPF and its agents have improperly benefited from this breach of fiduciary duty by APV to Tony Hochschild and by committing the acts described below, including but not limited to:

(a)     Misappropriating and disclosing GeoData's trade secrets and confidential information;

(b)     Formulating and planning and implementing a plan to injure the business of GeoData;

(c)     Working to develop a competing target balloon business using GeoData's intellectual property including its trade secrets; and

(d)         Interfering with GeoData's existing and prospective business relations.

85.    GeoData has been damaged as a direct and proximate result of the breach of fiduciary duty in an amount to be determined at trial.

## COUNT TEN
### Unjust Enrichment/*Quantum Meruit*

86.    The Plaintiff reincorporates all of its allegations contained in Paragraph 1 through 85 of the Complaint as if fully restated herein.

87.    The Defendants have been unjustly enriched by the misappropriation and use of GeoData's trade secrets and confidential information and the unfair competition with GeoData.

88.    Equity and good conscience require that any benefit obtained by the Defendants as a result of their unlawful action should inure it to the benefit of GeoData alone.

89.    As a result of the Defendants' unjust enrichment and via the principles of *quantum meruit* the Plaintiff GeoData respectfully requests that these Defendants be held responsible for the fruits of the labors of GeoData and disgorge not only the profits and monies that they improperly benefited from over the many years, but also provide an accounting of all sales and monies since 1997, provide for the information regarding the asset deal between APV and APPF and to pay attorney's fees, costs and expenses for the intentional unjust enrichment and quantum merit at the expense of GeoData.

## COUNT ELEVEN
### Federal Trademark Infringement

90.    The Plaintiff reincorporates all of its allegations contained in Paragraph 1 through 89 of the Complaint as if fully restated herein.

91.     GeoData is the owner of the "Killer Tomato" brand and first used it in commerce as early as 1997 in connection with the sale of certain target balloons to the United States and other militaries around the world.

92.     GeoData's use of the trademark has been substantially continuous for years.

93.     The trademark is entitled to protection under the Lanham Act, 15 USC §1051 *et seq*.

94.     As a result of GeoData's constant and extensive use of the trademark in connection with it's business, products and services and as a result of GeoData's constant and wide-spread advertising, the GeoData trademark "Killer Tomato's" is identified with GeoData's services in the public mind as far as we are concerned.

95.     However, the Defendants adopted the same or similar marks, the "Killer Tomato," for it use in connection with the sale of naval targets that, as used, is confusingly similar to GeoData's trademarks and will and has deceived the public.

96.     Defendants' use of the trademark has caused and it is likely to continue to cause, confusion and or mistake among or deceive the consumers of the products and purchasers who are likely to purchase these products from the Defendants believing those products are affiliated with GeoData thereby resulting in a loss of sales to GeoData.

97.     The Defendants knew or should have known of GeoData's use and ownership of the trademark "Killer Tomato."

98.     The Defendants' profits resulting from their infringements is now unknown to GeoData and needs to be ascertained with an accounting.

99.     Unless an injunction is granted, the Defendants will continue to infringe upon the trademark, intellectual property and cause irreparable harm to GeoData from loss of profits and deprivation of the benefit of the good will associated with the "Killer Tomato" trademark.

100.     Upon information and belief, the Defendants are purposely using the "Killer Tomato" marks in the exact channels used by GeoData.

101.     Upon information and belief, the Defendants willfully and deliberately sought to appropriate onto themselves the "Killer Tomato" trademark by advertising, offering for sale, and selling goods through the use of the "Killer Tomato" naval target.

102.     As a result of the Defendants' infringements of its trademarks, GeoData has and will continue to suffer damages and the infringement will continue unless enjoined by the Court.

### COUNT TWELVE
### Common Law and Trademark Infringements

103.     The Plaintiff reincorporates all of its allegations contained in Paragraph 1 through 102 of the Complaint as if fully restated herein.

104.     GeoData owns a valid trademark for the "Killer Tomato" and enjoys common law rights in the State of Ohio and throughout the United States and the world, to the "Killer Tomato" trademarks that are superior to any rights the Defendants are claiming in such marks in any form or style including any form or style on naval targets.

105.     GeoData is the first to use the trademark, or any trademark similar to it in association with the sale of "Killer Tomato" naval targets.  And, GeoData makes no reference to a movie and it is certainly not a movie production that they are selling.

106.     As a result of the continued sale of the good under the trademark, the trademark has become widely known and GeoData is identified in the public mind as the provider of the goods in which the trademark is supplied.

107.     Upon information and belief, Defendants with intentional disregard of GeoData's rights are selling, offering for sale and advertising within the market/channel areas, their goods using the infringed "Killer Tomato."

108.     Defendants' past and continued use of the infringing marks is causing confusion, deception and/or mistakenly leading the public to believe that the Defendants are associated with the "Killer Tomato" thus depriving GeoData of the good will associated and attached to GeoData's products.

109.     As a result of Defendants' infringement of the trademark common law rights, GeoData has and will continue to suffer damages.

### COUNT THIRTEEN
### Violation of Ohio Deceptive Trade Practices Act

110.     The Plaintiff reincorporates all of its allegations contained in Paragraph 1 through 109 of the Complaint as if fully restated herein.

111.     The Defendants have passed off their goods as those that they own in violation of GeoData's intellectual property and other rights.

112.     The Defendants' use of a similar or identical trademark causes likely confusion, misunderstanding into the source, sponsorship, approval and certification of the goods in that the public is and will continue to be confused with those promulgated by the Defendants.

113.     The Defendants engage in these practices in the course of their business, vocation and occupations.

114.     The Defendants caused and are likely to cause likelihood of confusion and misunderstanding as to the affiliation, connection, association and certification of GeoData's "Killer Tomato" marks.

115.    Therefore, pursuant to Ohio Revised Code Sec. 4165.02 the Defendants have engaged in deceptive trade practices which are willful and deliberate and have caused GeoData damages in an amount to be determined at trial.

### COUNT FOURTEEN
### Fraud, Fraudulent Inducement, Fraudulent Concealment and Fraudulent Representations

116.    The Plaintiff reincorporates all of its allegations contained in Paragraph 1 through 115 of the Complaint as if fully restated herein.

117.    The Defendant, Hy Zornes of APV knew that his entire understanding and knowledge of target balloons came from GeoData and Bruce Jackim.  His reason for creating them, his efforts to improve them and his promises to continue making them for GeoData were well known to Hy Zornes and APV and he had no business attempting to convey these to Tony Hochschild of APPF by agreement or otherwise and APPF should have known better.

118.    In fact, when APPF was told when GeoData learned of this situation and learned that APPF was actually diverting the sales of GeoData in the marketplace they took an arrogant and improper position that they were entitled to do whatever they wanted to because they bought the assets of APV without disclosing the fact that they knew or should have known that this information was all of the trade secrets, confidential/proprietary information of GeoData.

119.    But rather than deal with this issue straight up, they have hidden behind lawyers claiming that they had the right to do all of this by filing what they filed, notwithstanding the fact that they informed GeoData that they were doing this or put GeoData on notice that they were doing this and GeoData only found out about it accidentally through a third-party who thought they were buying the naval targets from GeoData when GeoData was wondering why no one was buying their targets, as sales were in fact being diverted by APPF to APPF.

24

120. The actions of the Defendants constitute fraud, fraudulent misrepresentation, fraudulent inducement, fraudulent concealment and omissions and both as to the taking of the Plaintiff's intellectual property and other rights, misusing the marketplace, informing third-parties that they had the right to do all of this and essentially cutting GeoData out of the equation completely despite the fact that GeoData was the one that created the market, thought of the concepts, improved the concepts and never expected that APV would simply turn on them in this fashion but apparently did.

121. As a result of the Defendants' fraud, the Plaintiff GeoData has been damaged in an amount to be determined at trial.

**WHEREFORE**, having fully plead the Complaint, GeoData Systems Management, Inc. respectfully requests that the Court grant a temporary, preliminary and permanent injunction against all Defendants requiring Defendants to:

1. Return GeoData's trade secrets, confidential and proprietary information;

2. Cease and desist from disclosing or using in any manner any of GeoData's trade secrets and confidential and proprietary information;

3. Cease and desist from unfairly competing with GeoData;

4. Assign to GeoData any and all contracts acquired by the Defendants;

5. Terminate and surrender to GeoData any and all contracts, whether in progress or not, for any work that should be GeoData's; and

6. An accounting of all sales, orders and financial information.

Additionally, GeoData requests the following relief:

A. Compensatory damages equal to the amount of GeoData's investments lost to Defendants;

B.     Disgorge monies equal to the amount of GeoData's lost profits from Defendants' unlawful activities;

C.     Award compensatory damages equal to the amount of GeoData's loss of future profits;

D.     Award treble damages pursuant to Ohio Revise Code Section 1333.63(B);

E.     Award attorneys' fees pursuant to Ohio Revised Code Section 1333.64(C);

F.     Award punitive damages against each Defendant to deter such misconduct in the future under Ohio, Federal, statutory and common law; and

G.     Grant GeoData the costs and expenses of this litigation, including maximum interest on all the sums owed and all other relief to which the Plaintiff is entitled;

H.     Any and all other relief to which GeoData may be entitled via statutory and common law remedies, both at state and federal law.

Respectfully submitted,

MICHAEL P. HARVEY CO., L.P.A.

/s/Michael P. Harvey
Michael P. Harvey, Esq. (#0039369)
311 Northcliff Drive
Rocky River, Ohio  44114-1344
Office: (440) 356-9108
Cell:   (440) 570-2812
Email: MPHarveyCo@aol.com
*Attorney for Plaintiff*

## JURY DEMAND

The Plaintiff GeoData Systems Management, Inc. respectfully gives notice to all parties and counsel of record that it requests a jury on all claims and issues so triable before a jury with the maximum number of jurors allowed under federal law.

/s/Michael P. Harvey
Michael P. Harvey, Esq. (#0039369)
*Attorney for Plaintiff*

MPH/sfm
H13973