# United States District Court
# Central District of California



FILED
CLERK, U.S. DISTRICT COURT

OCT 19, 2016

CENTRAL DISTRICT OF CALIFORNIA
BY:    BH    DEPUTY

GeoData Systems Management, Inc.

et al.,

Plaintiffs,

v.

American Pacific Plastic Fabricators,

Inc. et al.,

Defendants.

CV 15-4125-VAP (JEMx)

# Order Granting in Part and Denying in Part Defendant's Motion for Summary Judgment

Before the court is Defendant American Pacific Plastic Fabricators, Inc.'s ("Defendant") Motion for Summary Judgment, or in the alternative, Partial Summary Judgment, which Defendant filed on August 1, 2016. (Doc. No 156.) Plaintiff Geodata Systems Management, Inc. ("Plaintiff") filed its opposition to the motion on August 29, 2016, (Doc. No. 180) and Defendant filed its reply on September 12, 2016 (Doc. No. 194).  After considering all papers filed in support of, and in opposition to, the motion, as well as the arguments advanced at the hearing, the Court GRANTS the motion in PART and DENIES the motion in PART.

## I.    BACKGROUND

This is a dispute over who, if anyone, owns the rights to the trademark "Killer Tomato."  Both parties to this action are companies that supply militaries around the world with naval targets.  The targets at the core of this dispute are large orange balloons, which are sometimes referred to as "Killer Tomatoes."  After

United States District Court
Central District of California

United States District Court
Central District of California

working together for years, with Plaintiff marketing these targets and Defendant manufacturing them, tensions arose between the two companies, prompting each to go its separate way.  Now, Plaintiff argues it has the exclusive rights to use the trademark "Killer Tomato" in connection with naval targets.  Defendant disputes this and counterclaims that Plaintiff has, among other things, tortiously interfered with Defendant's prospective economic advantage.

In 1997, a Royal Malaysian Navy officer asked Bruce Jackim, acting for Plaintiff, to locate the manufacturer of vinyl balloons once used for naval gunnery practice in Malaysia.  (Second Am. Compl. ¶ 11.)  Jackim allegedly spoke with the original producer of the balloon, Charles Hightower, who told him the targets did not work and had not been made in many years.  (<u>Id.</u> ¶¶ 12-13.)  Nonetheless, Hightower referred Jackim to his son-in-law, Hy Zornes, indicating Zornes's company, APV, had the equipment necessary to make the targets.  (<u>Id.</u> ¶ 13.)  APV agreed to produce the targets.  (<u>Id.</u> ¶ 15.)

Plaintiff alleges that after APV began manufacturing the targets, Jackim located and spoke to prior users in the United States and Canadian militaries to determine how to redesign the old targets to ensure better functioning.  (<u>Id.</u> ¶ 18.)  He learned the original targets often burst and rolled over in the waves, their sea anchors did not work, and they could not return a radar signal.  (<u>Id.</u> ¶ 19.)  Jackim told Zornes he wanted to add a skirt that could be filled with water to stabilize the targets and prevent rollover.  (<u>Id.</u> ¶ 20.)  Although Zornes was initially agreeable to manufacturing more target balloons with the desired changes, no further contact was made until July 2001, when Zornes increased the cost of the targets.  (<u>Id.</u> ¶¶ 21–22.)

The increase was apparently higher than had been previously discussed and "result[ed] in cancellation of sales." (Id.)

Plaintiff alleges that Jackim later learned APV had sold all equipment and other assets related to the production of the target balloons to Defendant. (Id. ¶ 23.) Jackim contacted Defendant's Tony Hochschild in 2001 and began contracting with Defendant for the manufacture of target balloons with the new design improvements. (Id. ¶ 24.) At some point thereafter, Plaintiff learned Defendant had applied for a U.S. patent on the skirt design Jackim had shown to Zornes. (Id. ¶ 25.) Plaintiff did not know Zornes had given Hochschild the designs as part of the asset sale. (Id. ¶ 25.) When questioned, Hochschild explained that a patent had been filed and repeatedly referred to the patent as "our patent." (Id. ¶ 26.)

Unbeknownst to Plaintiff, Defendant allegedly misappropriated Plaintiff's product and began independently selling it to end-users as early as 2001 under the same name Plaintiff had been using to identify its product: "Killer Tomato." (Id. ¶ 37.) Defendant used the term "Killer Tomato" on its website and in printed materials delivered to customers and potential customers. (Id.) This strategy enabled Defendant to divert Plaintiff's sales. (Id.) For example, on September 20, 2007, Plaintiff allegedly sold and delivered fifteen targets to Port Hueneme. (Id. ¶ 38.) Thereafter, unbeknownst to Plaintiff, Port Hueneme contacted Defendant directly with all future orders. (Id.)

During the time Defendant manufactured Plaintiff's product, Jackim continued to innovate and improve it, e.g., by adding an enhanced internal radar reflector. Jackim prepared a prototype and .gif animation of the improvement and

delivered them to Hochschild to discuss integration into the product.  Defendant told Jackim it could not effectively incorporate the radar reflector and sold the reflector separately to attach externally.  However, unbeknownst to Plaintiff, Defendant allegedly began making independent sales of Plaintiff's product with an internal radar reflector and obtained a patent on Jackim's design in 2010.  (Id. ¶ 39.)

## II.  EVIDENTIARY OBJECTIONS

### A.  APPLICABLE LAW

"A trial court can only consider admissible evidence in ruling on a motion for summary judgment."  Orr v. Bank of Am., 285 F.3d 764, 773 (9th Cir. 2002).  At the summary judgment stage, district courts consider evidence with content that would be admissible at trial, even if the form of the evidence would not be admissible at trial.  See Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003); Block v. City of Los Angeles, 253 F.3d 410, 418–19 (9th Cir. 2001).

"[O]bjections to evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself" and are thus "redundant."  Burch v. Regents of Univ. of Cal., 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006); see also Anderson, 477 U.S. 242, 248 (1986) ("Factual disputes that are irrelevant or unnecessary will not be counted.").  Thus the Court does not consider any objections on the grounds that evidence lacks foundation, is speculative, or is irrelevant.

Hearsay statements in affidavits are inadmissible at summary judgment. Japan Telecom, Inc. v. Japan Telecom Am. Inc., 287 F.3d 866, 875 n.1 (9th Cir. 2002).  Hearsay is any out-of-court statement, whether oral or written, offered in evidence to prove the truth of the matter asserted.  Fed. R. Evid. 801(a), (c).  If an out-of-court statement is not introduced for the truth of the matter asserted, but to establish the effect on the listener or a basis in fact for the listener's subsequent actions, the statement is not hearsay.  See United States v. Payne, 944 F.2d 1458, 1472 (9th Cir. 1991) (holding that out-of-court statements introduced to show the effect on the listener are not hearsay).

## B.  Analysis

Both parties object to several statements in the proffered declarations and attached exhibits.  To the extent the objections do not consist of boilerplate claims that evidence is "irrelevant, speculative, . . . argumentative, or . . . an improper legal conclusion," the Court addresses them below.  To the extent the parties raise additional objections not addressed below, the Court has not relied on the corresponding assertions in deciding this matter and declines to address them.

### 1.    Declaration of Bruce A. Jackim in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment

In considering Defendant's motion for summary judgment, the Court only relied on paragraphs 3, 5, 19, and 23(c) of Bruce Jackim's declaration.  The Court did not rely on other assertions in Jackim's declaration as those facts were adequately supported by other evidence submitted by the parties.  Accordingly, the Court only addresses Defendant's objections directed at these paragraphs and only to the extent the objections do not consist of boilerplate.

United States District Court
Central District of California

5

United States District Court
Central District of California

### a) *Paragraph 3 and 5*

In paragraphs 3 and 5, Jackim describes his extensive service in the U.S. Navy from 1979 until 1991, including various locations in which he was stationed.  (Doc. No. 180-7 ¶ 3.)  Jackim states his duties included "being an instructor for shipboard operations, foreign officer training, and threat analysis; special training for U.S. and foreign personnel; command briefer for new developments and technologies, liaison with test, evaluation and special weapons systems facilities."  (Id.)  Further, Jackim states he served onboard a number of ships and "was involved in naval operations as well as personnel training."  (Id.)  He then declares he "was uniquely in a position to know of the use (or lack thereof) of an orange vinyl target balloon or any training apparatus utilized by the Navy that might have been called 'Killer Tomato,' if it existed," and he had "never seen or heard the name 'Killer Tomato' being used in reference to naval target balloons."  (Id. ¶ 5.)

Defendant objects on the grounds that Jackim lacks the necessary personal knowledge to state he was "uniquely in a position to know of the use (or lack thereof) of an orange vinyl target balloon" because he "was never a naval gunnery officer and does not . . . testify or lay foundation he ever witnessed or participated in Navy exercises utilizing orangish-red inflatable surface target balloons."  (Doc. No. 194-2 at 2.)

Jackim need not be a gunnery officer, however, to testify as to whether he ever heard anyone refer to a naval target balloon as a "Killer Tomato."  Jackim has stated (1) his career in the U.S. Navy spanned over eleven years; (2) he was an instructor for a number of different disciplines; (3) he was a "briefer for new developments and

United States District Court
Central District of California

technologies"; (4) he "served onboard a number of ships"; and (5) he was involved in both "naval operations as well as personnel training."  Such length and breadth of experience in different facets of the U.S. Navy—and the frequent interpersonal contact that accompanied Jackim's duties as an instructor—puts Jackim "uniquely in a position" to know how different U.S. Navy personnel use language to refer to items around them, including naval targets.  Thus, Jackim does have the necessary foundation and personal knowledge to state he was "uniquely in a position to know of the use (or lack thereof) of an orange vinyl target balloon."

Accordingly, the Court OVERRULES Defendant's objection.

### b)  Paragraph 19

In paragraph 19, Jackim states, "[t]hroughout our communications between 1997 and 2001, however, Zornes never referred to (or even hinted at) the target balloons being called 'Killer Tomato[es]' either orally or in writing. Additionally, Zornes never showed me or referred to a Flyer (hereafter 'Flyer') using the name 'Killer Tomato' to describe a target balloon."  (Doc. No. 180-7 ¶ 19.)  Defendant objects that this statement is hearsay.  (Doc. No. 194-2 at 6.)

Hearsay is any out-of-court statement, whether oral or written, offered in evidence to prove the truth of the matter asserted.  Fed. R. Evid. 801(a), (c).  Here, Jackim's testimony is not being offered to prove the truth of the matter asserted— indeed, since Jackim alleges Zornes never said anything regarding the "Killer Tomato," there is nothing being asserted in these out-of-court statements.  Instead, this evidence is offered to show Defendant did not use the "Killer Tomato" trademark from 1997 until 2001.  Use is an integral element to any trademark claim

and thus relevant to central issues of this dispute.  Further, as Jackim was in contact with Defendant during the relevant timeframe, he is especially competent to testify as to whether he witnessed Defendant use the trademark.  Thus, since the out-of-court statement is not being offered to prove its truth, it is not hearsay.

Accordingly, the Court OVERRULES Defendant's objection.

### c)   Paragraph 23(c)

In paragraph 23(c) Jackim explains how his interactions with Defendant's senior personnel led him to believe Plaintiff and Defendant had a contract to desist from dealing with each other's customers.  (Doc. No. 180-7 ¶ 23(c).)  In the guise of an objection, Defendant argues there was no agreement between Plaintiff and Defendant not to solicit the other's customers.  (Doc. No. 194-2 at 7.)  This is not a recognized evidentiary objection.  Further, Defendant asserts that Jackim's testimony is "[o]verbroad, [and] compound." Similarly, these are not recognized objections to testimony.  (Id. at 6.)  Last of all, Defendant asserts these statements are hearsay.  (Id.)  However, Jackim is not testifying to the truth of the matter asserted.  Instead he is testifying that Defendant's personnel made statements that would lead a reasonable person to believe a contract was formed.  Thus, because Jackim's testimony is not offered to prove the truth of Defendant's senior personnel's statements—and instead is being offered to show such language could form a contract—it is not hearsay.

Accordingly, the Court OVERRULES Defendant's objection.

United States District Court
Central District of California

**2.      Declaration of Nina Jackim in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment**

In Nina Jackim's declaration, she describes her extensive service in the U.S. Navy and U.S. Navy Reserve from 1980 until 2003, including the various locations in which she was stationed.  (Doc. No. 180-8 ¶¶ 3–5.)  Jackim states she served as an "Intelligence Analyst and Programs Officer" and her duties "entailed heading supply departments for intelligence training facilities and operational testing facilities as well as managing budgets for entire commands."  (Id. at ¶ 3)  Ms. Jackim then declares she "was uniquely in a position to know of the use (or lack thereof) of an orange vinyl target balloon or any training apparatus utilized by the Navy that might have been called 'Killer Tomato,' if it existed," and she had "never seen or heard the name 'Killer Tomato' being used in reference to naval target balloons." (Id. ¶¶ 4–5.)

Defendant argues Jackim lacks the personal knowledge to claim she "was uniquely in a position to know of the use (or lack thereof) of an orange vinyl target balloon or any training apparatus utilized by the Navy that might have been called 'Killer Tomato,' if it existed."  (Doc. No. 194-2.)  Jackim's declaration specifically states, "[b]ecause of my position as the head of several naval supply departments on the East and West coasts I managed and supervised all of the supply and usage needs of entire commands, which included land and sea aspects, to ensure that all supplies were accounted for and replenished when needed. Because of this, if any command which I oversaw had utilized a target balloon called 'Killer Tomato' I would have been privy to this information as a requisition for it would have been made through my office."  (Doc. No. 180-8 ¶ 4.)  Hence, it is clear Nina Jackim has the personal knowledge necessary to make the challenged statements.

United States District Court
Central District of California

Accordingly, the Court OVERRULES Defendant's objection.

### 3.     Declaration of Ernest E. Price in Support of Motion for Summary Judgment, or, Alternatively, Partial Summary Judgment

In his declaration, Ernest Price states "Attached hereto as Exhibit '18' are true and correct copies of relevant documents produced by [Plaintiff] in this litigation in support of Counter Claimant's Undisputed Material Facts, numbers 23, 24, 26, 29, 32, 34, 36, 37, 41-44, 47, 48, 50-53, 57 and 60-62. These aforementioned uncontroverted facts support, inter alia, summary judgment pertaining to [Defendant's] Counter-claim."  (Doc. No 157 ¶ 19.)  Plaintiff claims Price's statement lacks foundation but fails to assert why his statement lacks foundation. (Doc. No. 180-6 at 6.)

Price states earlier in his declaration, "I am of counsel with Ropers, Majeski, Kohn & Bentley, counsel of record for Defendants in this matter."  (Doc. No 157 ¶ 1.)  Thus, as counsel for Defendant in this matter, he does have personal knowledge of what was produced and foundation to make this statement.

Accordingly, the Court OVERRULES Plaintiff's objection.

## III.   LEGAL STANDARD

A motion for summary judgment or summary adjudication shall be granted when there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); <u>Anderson v. Liberty</u>

Lobby, Inc., 477 U.S. 242, 247-48 (1986).  The moving party must show that "under the governing law, there can be but one reasonable conclusion as to the verdict." Anderson, 477 U.S. at 250.

Generally, the burden is on the moving party to demonstrate that it is entitled to summary judgment.  Margolis v. Ryan, 140 F.3d 850, 852 (9th Cir. 1998); Retail Clerks Union Local 648 v. Hub Pharm., Inc., 707 F.2d 1030, 1033 (9th Cir. 1983). The moving party bears the initial burden of identifying the elements of the claim or defense and evidence that it believes demonstrates the absence of an issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Where the non-moving party has the burden at trial, however, the moving party need not produce evidence negating or disproving every essential element of the non-moving party's case.  Celotex, 477 U.S. at 325.  Instead, the moving party's burden is met by pointing out that there is an absence of evidence supporting the non-moving party's case.  Id.

"If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial."  Nissan Fire & Marine Ins. Co. v. Fritz Co., 210 F.3d 1099, 1102–03 (9th Cir. 2000).  "In such a case, the nonmoving party may defeat the motion for summary judgment without producing anything."  Id. at 1103.

If the moving party carries its burden of production, however, the burden then shifts to the non-moving party to show that there is a genuine issue of material

fact that must be resolved at trial.  See Fed. R. Civ. P. 56(e); Celotex, 477 U.S. at 324; Anderson, 477 U.S. at 256; Nissan Fire, 210 F.3d at 1103.  The non-moving party must make an affirmative showing on all matters in issue by the motion as to which it has the burden of proof at trial.  Celotex, 477 U.S. at 322; Anderson, 477 U.S. at 252. See also William W. Schwarzer, A. Wallace Tashima & James M. Wagstaffe, FEDERAL CIVIL PROCEDURE BEFORE TRIAL, § 14:144.  "This burden is not a light one.  The non-moving party must show more than the mere existence of a scintilla of evidence."  In re Oracle Corp. Secs. Litig., 627 F.3d 376, 387 (9th Cir. 2010) (citing Anderson, 477 U.S. at 252).

A genuine issue of material fact will exist "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Anderson, 477 U.S. at 248.  In ruling on a motion for summary judgment, a court construes the evidence in the light most favorable to the non-moving party.  Barlow v. Ground, 943 F.2d 1132, 1135 (9th Cir. 1991); T.W. Elec. Serv. Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630-31 (9th Cir. 1987).

## IV.   DISCUSSION

Defendant has moved for summary judgment on the following claims:

### A.  TRADEMARK CLAIMS:

To establish a claim for federal trademark infringement under the Lanham Act, a plaintiff must show: (1) it owns the trademark at issue; (2) the defendant has used in commerce, without authorization, a copy, reproduction, counterfeit or colorable imitation of the plaintiff's mark in connection with the sale, distribution, or advertising of goods and services; and (3) the defendant's

use of the mark is likely to cause confusion or to cause mistake or to deceive. 15 U.S.C. § 1114(1)(a); <u>Century 21 Real Estate Corp. v. Sandlin</u>, 846 F.2d 1175, 1178 (9th Cir. 1988).

There is no dispute that Defendant has used the trademark in commerce without Plaintiff's authorization.  Also, since both Plaintiff and Defendant use the same "Killer Tomato" mark to identify their products, they agree that their simultaneous use of the mark is likely to cause confusion or cause mistake or deceive.  Thus, the issue here is whether the trademark is a "valid, protectable trademark," and if so, who owns it.

### 1.   Trademark Validity

The Ninth Circuit recently summed up the law on trademark validity:

> To claim trademark infringement, a plaintiff must have a "valid, protectable trademark." <u>Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.</u>, 174 F.3d 1036, 1046 (9th Cir. 1999). The issue of trademark validity is considered "an intensely factual issue." <u>KP Permanent Make-Up</u>, 408 F.3d at 605. The plaintiff bears the ultimate burden of proof in a trademark-infringement action that the trademark is valid and protectable. <u>Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.</u>, 419 F.3d 925, 927–28 (9th Cir.2005).

> To be valid and protectable, a mark must be "distinctive." Distinctiveness measures "the primary significance of the mark to the purchasing public." <u>Quiksilver, Inc. v. Kymsta Corp.</u>, 466 F.3d

United States District Court
Central District of California

United States District Court
Central District of California

749, 760 (9th Cir.2006) (quotation marks omitted). In determining distinctiveness, "we are required to consider standards of meaning not our own, but prevalent among prospective purchasers of the article." Bada Co. v. Montgomery Ward & Co., 426 F.2d 8, 11 (9th Cir.1970); see also 2 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 11:70 (4th ed.2010)[hereinafter McCarthy]. . . . Marks are generally classified in one of five categories of increasing distinctiveness: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful. Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768, 112 S. Ct. 2753, 120 L. Ed. 2d 615 (1992). Which category a mark belongs in is a question of fact. See Lahoti v. VeriCheck, Inc., 586 F.3d 1190, 1195–96 (9th Cir.2009). Suggestive, arbitrary, and fanciful marks are considered "inherently distinctive" and are automatically entitled to federal trademark protection because "their intrinsic nature serves to identify a particular source of a product." Two Pesos, 505 U.S. at 768, 112 S. Ct. 2753. Generic marks are not eligible for trademark protection. Entrepreneur Media, 279 F.3d at 1141. Merely descriptive marks are somewhere in-between; although they are not inherently distinctive and are therefore not entitled to automatic trademark protection, a merely descriptive mark can become protectable if it has acquired distinctiveness "as used on or in connection with the applicant's goods in commerce." 15 U.S.C. § 1052(f). This acquired distinctiveness is referred to as "secondary meaning." Two Pesos, 505 U.S. at 769, 112 S. Ct. 2753.

Zobmondo Entm't, LLC v. Falls Media, LLC, 602 F.3d 1108, 1113 (9th Cir. 2010)

Plaintiff argues that the trademark is valid and protectable because it is arbitrary or suggestive and thus "inherently distinctive." On the other hand, Defendant argues the trademark is generic and thus invalid.

"An arbitrary mark consists of common words arranged in an arbitrary way that is non-descriptive of any quality of the goods or services. See Stork Restaurant Inc. v. Sahati, 166 F.2d 348, 355 (9th Cir.1948) ('[The Stork Club] is in no way descriptive of the appellant's night club, for in its primary significance it would denote a club for storks.')." Official Airline Guides, Inc. v. Goss, 6 F.3d 1385, 1390–91 (9th Cir. 1993). Suggestive marks "require a consumer to 'use imagination or any type of multistage reasoning to understand the mark's significance' and automatically receive protection." Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc., 618 F.3d 1025, 1033 (9th Cir. 2010).

Generic marks, however, "'refer[ ] to the genus of which the particular product is a species,' such as 'bread' or 'door,' and 'are not registerable' as trademarks." Id. at 1033 (quoting Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 194 (1985)). "To determine whether a term has become generic, we look to whether consumers understand the word to refer only to a particular producer's goods or whether the consumer understands the word to refer to the goods themselves." KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc., 408 F.3d 596, 604 (9th Cir. 2005).

Here, viewing the evidence in the light most favorable to the nonmoving party, the Court holds Plaintiff has presented sufficient evidence for a reasonable jury to determine that the "Killer Tomato" trademark is (1) not generic and (2) at least suggestive, if not arbitrary.  In Nina Jackim's Declaration, she states she had an extensive career in the U.S. Navy and her job duties included "heading supply departments for intelligence training facilities and operational testing facilities as well as managing budgets for entire commands."[1]  (Doc. No. 180-8 ¶¶ 3–4.)

---

[1] At the September 26, 2016 hearing, Defendant's counsel argued the declarations of Bruce and Nina Jackim have little probative value regarding consumer perception of whether "Killer Tomato" is generic because "'[a]ttestations from persons in close association and intimate contact with (the trademark claimant's) business do not reflect the views of the purchasing public.'" Self-Realization Fellowship Church v. Ananda Church of Self-Realization, 59 F.3d 902, 910 (9th Cir. 1995). Defendant's counsel argued two cases, Self-Realization Fellowship Church and Krav Maga Association of America, Inc. v. Yanilov, 464 F. Supp. 2d 981 (C.D. Cal. 2006), supported this conclusion.

A close reading of the cases, however, shows otherwise.  In Self-Realization, a church offered declarations by employees and wholesalers of the church, which only stated "they think of [the church] when they hear the term 'self-realization.'" 59 F.3d at 910.  Thus, the declarations "had 'little probative value regarding the assessment of consumer perception.'" Id.  In contrast, here, Plaintiffs' declarations state (1) while working in the Navy, they were in a position to hear of "killer tomatoes" if they existed and (2) never did.  The Jackims' declarations, which state objective facts regarding their experiences before they were Plaintiff's employees, are much more probative of consumer perception than the declarations considered in Self-Realization, which only stated a subjective association experienced while the declarants were working for the church.  Thus, the Jackims' testimony is not subject to the same "close association and intimate contact" reasoning used in Self Realization.  Id.

Further, in Krav Maga Association of America, a martial-arts school's declarations were from the school's former students, a licensee of the school, and an advertising director of a publication the school advertised in.  464 F. Supp. 2d at 988. The declarations only stated, "[the school's] teaching of 'krav maga' is unique and exclusive to [the school]" and thus were insufficient evidence of non-genericness. Id.  Here, however, Plaintiff's proffered declarations include Dr. Leonard's and Peck's, and the Jackims' declarations state more than "Killer Tomatoes" are

United States District Court
Central District of California

Throughout her military career and afterward, she had "never heard or been made aware of any entity other than my husband and myself having used the name 'Killer Tomato' ('Trademark') in reference to naval target balloons or target balloons of any other type, [apart from Defendant's alleged infringement]." (Doc No. 180-8 ¶ 5.)  Further, in his declaration, Bruce Jackim states he "served in the U.S. Navy ('Navy') from 1979 to 1991" and that "[t]hroughout [his] career in the Navy, and at every geographical location that [he] served at (including San Diego), however, [he] never [saw] or heard the name 'Killer Tomato' being used in reference to naval target balloons or target balloons of any other type."  (Doc No. 180-7 ¶¶ 3, 5.)  Richard Peck, a Navy officer involved in purchasing target balloons since approximately 2014 (Doc. No. 186-5 at 39–40), testified he never heard the term "Killer Tomato" until March 2016 (id. at 41).  Peck also testified, "during the years that [he] worked for the defense department, that the only company that [he] associate[d] with the name killer tomato is GeoData," and he was "not aware of any other use of the term 'killer tomato' by any other vendor or by the Navy in general." (Id. at 46, 46.)  This testimony provides considerable support for Plaintiff's claim that "Killer Tomato" is not generic.

Plaintiff also provides an expert report from Dr. Robert A. Leonard, a professor of linguistics at Hofstra University, to support its assertions the term "Killer Tomato" is not generic.  (Doc. No. 180-12.)  Defendant argues Dr.

"unique and exclusive to" Plaintiff.  Instead, the Jackims' declarations specifically state objective facts showing: (1) while working in the Navy, the Jackims were in a unique position to hear of "Killer Tomatoes" if they existed and (2) never did.  Thus, the Jackims' declarations are much more probative of consumer perception than those in Krav Maga Association of America, and when combined with Dr. Leonard and Peck's testimony, Plaintiff has provided sufficient evidence of non-genericness.

United States District Court
Central District of California

Leonard's report is simply a rebuttal of Defendant's expert report and should not qualify as evidence that "Killer Tomato" is not generic.  Defendant points out that in Dr. Leonard's deposition, he stated "my work here was not necessarily to establish ["Killer Tomato" was not generic], but to see whether [Defendant's expert] had made [a] case for that which he claimed in his report." (id. at 58.) Nonetheless, an examination of the report reveals considerable evidence that "Killer Tomato" is not a generic term.  Dr. Leonard's report goes into depth on how the use of the term "Killer Tomato" in newspaper articles (id. at 9), U.S. Navy communications (id. at 10), and the U.S. Navy website (id. at 11–19) supports the conclusion that persons in the U.S. Navy did not use the term "Killer Tomato" as a generic reference.  Dr. Leonard's report specifically states "[Defendant's expert] erroneously claims that KILLER TOMATO is generic in U.S. naval military speech" (id. at 37) and "[e]xamples [Defendant's expert] claims demonstrate genericness actually demonstrate the opposite" (id. at 38).  Furthermore, the report states, "what the record shows, as [Defendant's expert] himself documents, and to which I have added examples from the Navy's own web site, is that to the present day (or one month ago) usage in this official, in-group publication still showed markers of non-genericism." (Id. at 49.)  Thus, the report contains considerable information supporting Plaintiff's claim that the term "Killer Tomato" is not generic.

Further, Defendant's own actions tend to show that the term is not generic. Specifically, Defendant attempted to register "Killer Tomato" as a trademark with the United States Patent and trademark Office in July 2012.  Defendant also acquired a license to use the term "Killer Tomato" from W. Finletter Films, LLC, which owns the "Killer Tomato" trademark associated with the classic movies "Attack of

United States District Court
Central District of California

the Killer Tomatoes!" "Return of the Killer Tomatoes!" "Killer Tomatoes Strike Back!" and "Killer Tomatoes Eat France!"  It stands to reason that if no reasonable jury could decide "Killer Tomato" was eligible for trademark protection, Defendant would not have made such efforts to register it as a trademark and purchase the trademark license from W. Finletter Films, LLC.

In addition, Plaintiff has provided sufficient evidence for a reasonable jury to conclude the mark is arbitrary or suggestive.  "An arbitrary mark consists of common words arranged in an arbitrary way that is non-descriptive of any quality of the goods or services." Official Airline Guides, Inc., 6 F.3d at 1390–91.  Here, the mark "Killer Tomato" arguably does not describe "any quality" of the large, orange, naval target to which it refers.  "Tomato" is defined as, "the usually large rounded typically red or yellow pulpy berry of an herb (genus *Lycopersicon*) of the nightshade family native to South America."  (Merriam-Webster, Definition of Tomato, http://www.merriam-webster.com/dictionary/tomato.) Tomatoes come in a wide variety of colors, including red, orange, yellow, purple, and various hues and combinations in between.  Tomatoes also come in a wide variety of sizes, ranging from the Red Currant Spoon Tomato, which can sit on the face of a penny, to the Gigantomo, which can grow to roughly the size of a basketball.  The world's biggest tomato weighed between eight and nine pounds.

"Killer" is defined as (1) "one that kills," (2) "one that has a forceful, violent, or striking impact," or (3) "one that is extremely difficult to deal with." (Merriam-Webster, Full Definition of Killer, http://www.merriam-webster.com/dictionary/killer.)  The large, orange, naval target that is the subject of this litigation, however, is substantially shaped like a cube with six pointed corners.

United States District Court
Central District of California

The targets float in the ocean, and the U.S. Navy, among others, shoots at them from boats and helicopters as part of live-fire exercises and other training. The targets are large—much larger than even the world's biggest tomato—and require three or more sailors to push them over the side of a boat and into the ocean. The target does not kill anything, nor does it have a "forceful, violent, or striking impact," nor is it "extremely difficult to deal with." Quite the contrary, the target's main purpose is to bob docilely in the water while being shot at by service members on boats and helicopters. Hence, there is sufficient evidence for a reasonable jury to conclude the mark is entirely "non-descriptive of any quality of the goods" and thus arbitrary.

Similarly, there is sufficient evidence for a reasonable jury to conclude the mark is suggestive. Suggestive marks "require a consumer to 'use imagination or any type of multistage reasoning to understand the mark's significance' and automatically receive protection." Fortune Dynamic, Inc., 618 F.3d at 1033. Given the significant dissimilarities between the large, orange, naval target and the words "Killer Tomato" described above, it would require quite a mental leap to connect the words "Killer Tomato" to a large, orange, docile balloon that sits in the ocean and serves as a target for military vessels. Hence, there is sufficient evidence for a reasonable jury to conclude customers would be required to use their imaginations to understand the significance of the "Killer Tomato" mark.

Accordingly, the Court holds Plaintiff has presented sufficient evidence for a reasonable jury to determine the "Killer Tomato" trademark is not generic. Also, sufficient evidence exists for the jury to determine "Killer Tomato" is either arbitrary or suggestive.

United States District Court
Central District of California

### 2.    Senior User

"The first to use a mark is deemed the 'senior' user and has the right to enjoin 'junior' users from using confusingly similar marks in the same industry and market or within the senior user's natural zone of expansion." Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp., 174 F.3d 1036, 1047 (9th Cir. 1999); see New W. Corp. v. NYM Co. of Cal., 595 F.2d 1194, 1200 (9th Cir. 1979).  Defendant claims that it was the senior user because it was the first to use the trademark, and thus no reasonable jury could conclude Plaintiff owned the trademark.

Plaintiff admits it "began using the Trademark in 2002 and used the Trademark in interstate commerce in 2005 at the latest." (Doc. No. 180 at 2.) Defendant claims it used the trademark (through its predecessor APV) "from the mid-1980s to 1998."  Defendant also submitted a flyer, which Defendant (through its predecessor AVP) used to market the "Killer Tomato" to potential customers. (Doc. No. 156-3 Ex. B)  This flier refers to the target balloon as "The Killer Tomato" multiple times, and the deposition testimony of Zornes and the declaration of Ernest E. Price suggest the document was created in approximately 1997 or 1998. (Doc. Nos. 157 Ex. 6, 156-3.) On the other hand, Plaintiff puts forth evidence disputing the authenticity of the flyer.  Bruce Jackim states in his declaration that, in all of his dealings with Zornes, Zornes never "referred to (or even hinted at) the target balloons being called 'killer tomato'" and never showed Jackim the flyer. (Doc No. 180-7 ¶ 19.)  Further, Plaintiff puts forth evidence showing Defendant's invoices and other documents prior to 2004 contain no mention of the trademark.  Hence, there is sufficient evidence for a reasonable jury to conclude that Plaintiff, and not Defendant, was the senior user and owned the trademark, and the Court holds there

remains a genuine issue of material fact regarding whether Defendant was the first to
use the trademark.

### 3.      Whether Defendant received Trademark Rights from its predecessor AVP

Although Defendant contends it purchased the rights to the trademark from
AVP in 1998, Plaintiff claims Defendant only purchased materials from AVP, and
thus Defendant never received the rights to the trademark from AVP.  The
deposition testimony of Debbie Pensis stating Defendant agreed to pay AVP for the
"Killer Tomatoes" Defendant sold and the lack of a written contract setting forth
the terms of the sale of the business both raise genuine issues of material fact
regarding whether Defendant received trademark rights from AVP.

### 4.      Abandonment

Plaintiff argues, in the alternative, that Defendant abandoned use of the
trademark from 1998 until 2007.  Defendant, however, argues it did not abandon the
trademark, and instead it continued to use the trademark on flyers it acquired from
AVP to advertise the "Killer Tomato" and used them through 2001.   After 2001,
Defendant argues, Plaintiff used the trademark under an implied license Defendant,
and this implied license is considered use of the trademark by Defendant.

Under the Lanham Act, a trademark is abandoned "[w]hen its use has been
discontinued with intent not to resume such use. Intent not to resume may be
inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie
evidence of abandonment. 'Use' of a mark means the bona fide use of such mark
made in the ordinary course of trade, and not made merely to reserve a right in a

mark." 15 U.S.C. § 1127.  "Because the abandonment inquiry is tied to the unique
circumstances of each case, it is appropriate to look at the totality of the
circumstances to determine if genuine, albeit limited, usage of the mark qualifies a
trademark use 'in the ordinary course of trade' under § 1127."  <u>Electro Source, LLC</u>
<u>v. Brandess-Kalt-Aetna Grp., Inc.</u>, 458 F.3d 931, 940 (9th Cir. 2006).  The following
factors are considered in determining whether use of a trademark qualifies as use "in
the ordinary course of trade": (1) "the genuineness and commercial character of the
activity"; (2) "the determination of whether the mark was sufficiently public to
identify or distinguish the marked service [or product] in an appropriate segment of
the public mind as those of the holder of the mark"; (3) "the scope of the
[trademark] activity relative to what would be a commercially reasonable attempt to
market the service [or product]"; (4) "the degree of ongoing activity of the holder to
conduct the business using the mark"; (5) "the amount of business transacted"; and
(6) "other similar factors which might distinguish whether a service [or product] has
actually been 'rendered in commerce.'"  <u>Chance v. Pac–Tel Teletrac Inc.</u>, 242 F.3d
1151, 1159 (9th Cir.2001).

As discussed above, whether Defendant continued to use the trademark on
flyers it originally acquired from AVP to advertise the "Killer Tomato" and used
them through 2001 is a question of fact. Plaintiff has provided sufficient evidence for
a reasonable jury to decide the flyer may not have been used during this time,
including (1) Bruce Jackim's declaration stating, "Zornes never referred to (or even
hinted at) the target balloons being called 'killer tomato' [nor] showed me or referred
to a Flyer" (Doc No. 180-7 ¶ 19) and (2) Defendant's invoices for target balloons,
which do not mention the term "Killer Tomato" from 1998 through 2000 (Doc. No.
193-1 at 1–256; Doc. No. 193-2 at 93–96).

In contrast, there is no genuine dispute that Defendant continued to use the trademark from 2002 onward.  Although the parties agree there was no express licensing agreement between the parties, the parties also agree Plaintiff and Defendant "began doing business [together] in 2002," with preliminary talks beginning in 2001.  (Doc. No. 180 at 7.)  Further, in 2001, Plaintiff began marketing efforts using the name "Killer Tomato."  (Doc No. 97 at 8).  Starting in late 2001, "[Plaintiff] referred to 'Killer Tomatoes' in emails to [Defendant] regarding customer purchases, and the product was first sold under the name 'Killer Tomato' in late 2001."  (Id. at 8; see e.g., Doc. No. 186-9 at 33.)  During the business relationship, Plaintiff solicited customers that wished to purchase "Killer Tomatoes," (Doc. No. 180 at 8), and "[o]nce Plaintiff found a willing customer, Plaintiff "placed the order with [Defendant] to ship the order directly to the customer."  (Id.)  "The customer paid [Plaintiff] and [Plaintiff] paid [Defendant]."  (Id.)  There is no indication that Plaintiff shipped the "Killer Tomatoes" to any customer.

It is undisputed that each time Plaintiff sold a "Killer Tomato," it placed an order with Defendant for a "Killer Tomato."  Thus, from 2002 onward, the undisputed facts show Defendant was selling "Killer Tomatoes" to Plaintiff, under the trademark "Killer Tomato," which Plaintiff admits was used in purchase-related emails.  Also, each time Plaintiff used the term "Killer Tomato" to obtain orders from customers and Defendant shipped the "Killer Tomato" to the customer directly, Defendant was distributing its product under the trademark "Killer Tomato."  In other words, every time Plaintiff used the trademark to sell "Killer Tomatoes" to customers, Defendant (1) sold Plaintiff a "Killer Tomato" under the

United States District Court
Central District of California

trademark and (2) distributed "Killer Tomatoes" directly to customers under the trademark.  Applying the above factors, (1) this was genuine commercial activity; (2) under this business relationship, the mark was sufficiently public because all the customers who purchased "Killer Tomatoes" did so under the trademark; (3) the scope of the trademark activity was commercially reasonable because it extended to all of Plaintiff's customers and Plaintiff itself, who was a customer; (4) the business activity was continuous from 2002 onward; and (5) the amount of business transacted was substantial.  Hence, the undisputed facts show that if Defendant owned the trademark to begin with, it did not abandon it after 2002.

In sum, the Court finds there is sufficient evidence for a reasonable jury to find Plaintiff owns the rights to the trademark.  Thus, the Court DENIES Defendant's motion for summary judgment as it relates to Plaintiff's first claim for relief (false advertising under Lanham Act § 43(a)), fourth claim for relief (unfair competition under Lanham Act § 43(a), 15 U.S.C. § 1125(a)), tenth claim for relief (federal trademark infringement),[2] and eleventh claim for relief (common law trademark infringement).  Also, the Court DENIES Defendant's motion for summary judgment on Plaintiff's seventh claim for relief (unfair competition under California Business and Professions Code section 17200) but only as it pertains to Defendant's alleged unlawful use of the trademark.

---

[2] "Whereas section 32 [of the Lanham Act] provides protection only to registered marks, section 43(a) protects against infringement of unregistered marks and trade dress as well as registered marks, see, e.g., Kendall–Jackson Winery, Ltd. v. E. & J. Gallo Winery, 150 F.3d 1042, 1046 (9th Cir.1998), and protects against a wider range of practices such as false advertising and product disparagement, see 15 U.S.C. § 1125(a)(1)(B); Two Pesos, Inc. v. Taco Cabana, 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992)."  Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp., 174 F.3d 1036, 1047 (9th Cir. 1999).

United States District Court
Central District of California

## B.  Trade Secret Claims

### 1.      Plaintiff's Customer List

Plaintiff claims Defendant misappropriated its customer list by using "key man contact information" it received from Plaintiff to sell directly to Plaintiff's customers.  Defendant, however, argues the customer list is not a trade secret because the customers were generally known and used by other good faith competitors.

"Under the UTSA, a prima facie claim for misappropriation of trade secrets 'requires the plaintiff to demonstrate: (1) the plaintiff owned a trade secret, (2) the defendant acquired, disclosed, or used the plaintiff's trade secret through improper means, and (3) the defendant's actions damaged the plaintiff.'" Cytodyn, Inc. v. Amerimmune Pharm., Inc., 160 Cal. App. 4th 288, 297 (2008) (citing Sargent Fletcher, Inc. v. Able Corp., 110 Cal. App. 4th 1658, 1665 (2003)).  A trade secret is information that "(1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  Cal. Civ. Code § 3426.1(d); MAI Sys. Corp. v. Peak Computer, Inc., 991 F.2d 511, 521 (9th Cir. 1993). Although, "[i]f an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished." Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1002 (1984).

United States District Court
Central District of California

The undisputed facts show Plaintiff "disclosed to [Defendant] key man contact information including individual names and addresses, as well as other customer information" to allow Defendant to ship "Killer Tomatoes" to customers. (Doc. No. 180 at 8.)  Thus, since Plaintiff admits it disclosed its customer data to Defendant for shipping purposes, for Plaintiff to retain its trade-secret rights, it needs to show Defendant was under an "obligation to protect the confidentiality of the information." The only evidence Plaintiff offers on this point is deposition testimony from Deborah Pensis, Defendant's "person most knowledgeable," and a declaration of Bruce Jackim, Plaintiff's CEO.  Bruce Jackim's declaration states, in pertinent part, "[Defendant] and [Plaintiff] agreed that [Defendant] would not sell naval target balloons to [Plaintiff's] customers or prospective customers." (Id.)  The deposition testimony of Deborah Pensis, however, states only "if someone called [Defendant] directly and [Defendant] knew that they were [Plaintiff's] customer, meaning that [Defendant] had shipped to them previously or if they mention that they had talked to [Plaintiff], that [Defendant] would revert them back to [Plaintiff] as a courtesy.  But [Defendant] sold our product open market just like anyone else, or anybody else.  And there was no 'This is mine. This is yours.'" (Doc. No. 186-1 at 70).  Further, the declaration of Bruce Jackim states only that Defendant "specifically assured me that [Defendant] would not sell their target balloons to [Plaintiff's] customers or prospective customers. Attached hereto as Exhibits H and I are two true and correct copies of emails that I received in or about the dates indicated which contain highlighted language confirming this arrangement . . . . Based upon these conversations, I reasonably believed that [Defendant] would maintain the confidentiality and secrecy of our customer information."  (Doc. No. 180-7 ¶ 23(c).)  At most, these emails show that Plaintiff and Defendant had an agreement not to sell to each other's customers.  (Doc. No. 186-9 at 31–35.)

27

Nowhere is it mentioned that Defendant would keep confidential the customer information Plaintiff freely and voluntarily disclosed to Defendant.  (Id.)  Indeed, even if there existed a fully binding agreement under which Defendant was not allowed to sell to Plaintiff's customers, Defendant would have been fully within its rights to disseminate the customer data to others in the relevant market.  Thus, Plaintiff disclosed its "trade secret to others who are under no obligation to protect the confidentiality of the information," and Plaintiff's property rights to its customer information were extinguished.

Thus, even if Plaintiff had trade secret rights to its customer list, the undisputed facts show Plaintiff extinguished those rights when it disclosed its customers' information to Defendant.  Accordingly, the Court GRANTS Defendant's motion for summary judgment with regards to Plaintiff's fifth claim for relief (misappropriation of trade secrets regarding Plaintiff's customer list).  Also, the Court GRANTS Defendant's motion for summary judgment on Plaintiff's seventh claim for relief (unfair competition under California Business and Professions Code section 17200) but only as it relates to Defendant's alleged unlawful use of Plaintiff's trade secrets.

**2.    Plaintiff's Skirt and RADAR Reflective Material**

Defendant claims that there is no evidence Plaintiff's placement of a skirt and RADAR reflective material on the "Killer Tomato" was a trade secret, and even if it were, Plaintiff lost its property rights by disclosing it to the general public.  The first requirement of a trade secret is it must derive "independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use."  Ruckelshaus, 467 U.S. at

United States District Court
Central District of California

1002.  Defendant points out that both the skirt and the RADAR reflective material were generally known by the public because the skirt and the RADAR material could clearly be seen by anyone who purchased a "Killer Tomato."  (Doc. No. 156-1.)  Also, Defendant points out Plaintiff's website advertised that the "Killer Tomato" "includes a built in false bottom skirt which acts as drogue to stabilize Target and prevent rolling in moderate seas."  (Doc. No. 156-1 Ex. 8.)  Plaintiff has offered no evidence to rebut this argument nor has it offered evidence to support its claim that it possesses a trade secret in the "Killer Tomato's" skirt and RADAR reflective material.  (Doc. No. 180.)  Thus, the Court finds that there is not sufficient evidence to support a jury finding that the skirt and RADAR reflective material were trade secrets.

Accordingly, the Court GRANTS Defendant's motion for summary judgment with regards to Plaintiff's fifth claim for relief (misappropriation of trade secrets claims concerning the "Killer Tomato's" skirt and RADAR reflective material).

## C.   BREACH OF CONTRACT CLAIM

Plaintiff claims that Defendant breached its oral contract in which defendant agreed "to refrain from selling to [Plaintiff's] customers."  (Doc. No. 180 at 23.)  Defendant, however, argues this oral contract was in restraint of trade and invalid pursuant to California Business and Professions Code section 16600.

Section 16600 of the California Business and Professions Code states, "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."  Cal. Bus. & Prof. Code § 16600.

California courts "have been clear in their expression that section 16600 represents a strong public policy of the state which should not be diluted by judicial fiat." Edwards v. Arthur Andersen LLP, 44 Cal. 4th 937, 949 (2008).  "Antisolicitation covenants are void as unlawful business restraints except where their enforcement is necessary to protect trade secrets." Moss, Adams & Co. v. Shilling 179 Cal. App. 3d 124, 130 (1986); Thompson v. Impaxx, Inc., 113 Cal. App. 4th 1425, 1429 (2003).

The undisputed facts show Plaintiff's alleged oral contract, which prevented Defendant from doing business with Plaintiff's customers, is an antisolicitation contract.  (Doc. No. 180 at 25.)  Thus, such a contract cannot be valid under section 16600 unless it is "necessary to protect trade secrets."  As discussed above, the undisputed facts also show Plaintiff eliminated any property right it had in its customer list trade secret by sharing the customer list information with Defendant without any confidentiality restrictions.  Thus, since Plaintiff had no trade secret to protect, the oral contract could not have been "necessary to protect" a trade secret.  Hence, since the contract was not "necessary to protect trade secrets" the contract is void under section 16600.

Plaintiff cites one case, Gordon v. Landau, 49 Cal. 2d 690 (1958), holding that an antisolicitation contract between an employee and employer was "necessary to protect" the employer's customer list, but Plaintiff has not cited—and the court has not found—any cases holding an antisolicitation contract between two potentially competing companies is "necessary to protect" a customer list.  Indeed, cases in which courts have ruled an antisolicitation contract is "necessary to protect" a trade secret are largely limited to contracts in the employer-employee context.  See e.g. Wanke, Indus., Commercial, Residential, Inc. v. Superior Court, 209 Cal. App. 4th

1151, 1180 (2012), as modified on denial of reh′g (Oct. 29, 2012); <u>Gordon v. Wasserman</u>, 153 Cal. App. 2d 328, 330 (1957); <u>Edwards</u>, 44 Cal. 4th at 946 n.4.

Accordingly, the Court GRANTS Defendant's summary judgment motion as to Plaintiff's eighth claim for relief (breach of contract).

### D.  DECLARATORY RELIEF

Plaintiff seeks a declaration "that there was no binding agreement with any Defendant which would have allowed any Defendant to utilize [Plaintiff's] intellectual property for their own gain without compensating [Plaintiff]."  (Doc. No. 97 at 17.)  Defendant does not dispute this.  (Doc. No. 156-1 at 22.)  Thus, since the undisputed facts show that there was "no binding agreement," the Court DENIES Defendant's motion for summary judgment as it relates to Plaintiff's third claim for relief (declaratory judgment).

### E.  FRAUD CLAIMS

Defendant has moved for summary judgment on Plaintiff's fraud claims. (Doc. No. 156-1).  In Plaintiff's opposition, Plaintiff states "[e]ven though there are facts to support this claim, Plaintiff abandons its fraud claim." (Doc. No. 180 at 35.) Thus, the Court GRANTS Defendant's motion for summary judgment as it relates to Plaintiff's twelfth claim for relief (fraud, fraudulent inducement, fraudulent concealment and fraudulent representations).

### F.  INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

Plaintiff contends Defendant interfered with its prospective economic advantage by using its trademark to solicit Plaintiff's repeat customers. (Doc. No.

180 at 26–27.)  Defendant, however, argues Plaintiff's claim for interference with prospective economic advantage must be dismissed because there is (1) no evidence of independent wrongful conduct and (2) no evidence of misappropriation of customers. (Doc. No. 156-1 at 18–19.)

> The elements of a claim for intentional interference with prospective economic advantage are 1) an economic relationship between the plaintiff and third party containing the probability of future economic benefit to the plaintiff, 2) knowledge by the defendant of the existence of the relationship, 3) intentional acts on the part of the defendant designed to disrupt the relationship, 4) actual disruption of the relationship, and 5) damages to the plaintiff proximately caused by the acts of the defendant."

Ingrid & Isabel, LLC, 70 F. Supp. 3d at 1120 (citing Visto Corp. v. Sproqit Techs., Inc., 360 F. Supp. 2d 1064, 1066 (N.D. Cal. 2005); Della Penna v. Toyota Motor Sales USA, Inc., 11 Cal. 4th 379, 389 (1995)).

A "plaintiff seeking to recover for alleged interference with prospective economic relations has the burden of pleading and proving that the defendant's interference was wrongful by some measure beyond the fact of the interference itself." Della Penna, 11 Cal. 4th at 393. See also Vistan Corp. v. Fadei USA, Inc., No. C-10-4862 JCS, 2011 WL 1544796, *9 (N.D. Cal. Apr. 25, 2011). "'California courts have held that independently wrongful conduct includes 'actions which are independently actionable, violations of federal or state law or unethical business practices, e.g., violence, misrepresentation, unfounded litigation, defamation, trade

libel or trade mark infringement.'" <u>Reid-Ashman Mfg., Inc. v. Swanson
Semiconductor Serv., L.L.C.</u>, No. C-06-4693 JCS, 2007 WL 1394427, *12 (N.D.
Cal. May 10, 2007) (quoting <u>PMC, Inc. v. Saban Entm't, Inc.</u>, 45 Cal. App. 4th 579,
603 (1996)).

     As discussed above, there is a genuine issue of material fact regarding
whether Plaintiff owned the rights to the trademark.  It is also undisputed that
Defendant used the trademark in soliciting customers that had ongoing business
relationships with Plaintiff.  Thus, if Plaintiff is found to have owned the trademark,
Defendant's use of the trademark to solicit customers would infringe on Plaintiff's
trademark rights.  Since "California courts have held that independently wrongful
conduct includes . . . trademark infringement," Defendant's use of Plaintiff's
trademark would be sufficient to show "independently wrongful conduct" that
disrupted Plaintiff's business relationships with repeat customers.  Since genuine
issues of material fact remain, the Court DENIES Defendant's motion for summary
judgment as it relates to Plaintiff's sixth claim for relief (intentional interference
with prospective economic advantage).

## G.  Trade Libel Claims

     Plaintiff claims that Defendant committed trade libel by including the
statement "Killer Tomatoes trademark & Copyrights are owned by W. Finletter
Films, LLC.  Killer Tomatoes are used with permission" on Defendant's marketing
materials for the "Killer Tomato."  (Doc. No. 180 at 31.)  Defendant claims that such
a claim does not disparage Plaintiff's product and is thus not trade libel.

United States District Court
Central District of California

"Under California law, 'trade libel is an intentional disparagement of the quality of property, which results in pecuniary damage.'" New.Net, Inc. v. Lavasoft, 356 F. Supp. 2d 1090, 1113 (C.D. Cal. 2004) (quoting Films of Distinction, Inc. v. Allegro Film Prod., Inc., 12 F. Supp. 2d 1068, 1081 (C.D. Cal.1998)). "To prove trade libel, Plaintiff must show (1) a statement that (2) was false, (3) disparaging, (4) published to others in writing, (5) [that] induced others not to deal with it, and (6) caused special damages." Id. (citing Atl. Mut. Ins. Co. v. J. Lamb. Inc., 100 Cal. App. 4th 1017, 1035 (2002)); see also Homeland Housewares, LLC v. Euro-Pro Operating LLC, No. CV 14-03954 DDP (MANx), 2014 WL 6892141, *4 (C.D. Cal. Nov. 5, 2014) (same). The false and misleading statement "(1) must specifically refer to the plaintiff's product or business and (2) must clearly derogate that product or business. Each requirement must be satisfied by express mention or by clear implication." Hartford Cas. Ins. Co. v. Swift Distrib., Inc., 59 Cal. 4th 277, 291 (2014); Kim v. Truck Ins. Exch., No. CV 14-4270 RSWL (VBKx), 2015 WL 3912452, *4 (C.D. Cal. June 25, 2015) (same). "The specific reference requirement may be satisfied by implication 'where the suit alleges that the insured's false or misleading statement necessarily refers to and derogates a competitor's product.'" Bullpen Distrib., Inc. v. Sentinel Ins. Co., 584 Fed. Appx. 769, 771 (9th Cir. Sept. 10, 2014) (Unpub. Disp.) (quoting Hartford Cas. Ins. Co., 59 Cal. 4th at 294).

A defendant does not make a disparaging statement concerning another's product simply by imitating it or otherwise infringing the intellectual property associated with it. See Homedics, Inc. v. Valley Forge Ins. Co., 315 F.3d 1135, 1142 (9th Cir. 2003) ("Nikken's complaints only allege that Homedics imitated its product, thereby infringing its patent.  It does not follow that because an entity imitated the design of a product, it is, therefore, disparaging it. In point of fact, it's

United States District Court
Central District of California

1  quite the opposite – as has been oft said: imitation is the highest form of flattery");

2  Microtec Research, Inc. v. Nationwide Mut. Ins. Co., 40 F.3d 968, 972 (9th Cir.

3  1994) (holding that a complaint did not state a claim for trade libel because "[t]he

4  claims raised were that Microtec 'palmed off' Green Hills′ compilers [i.e. infringed

5  on Microtec's trademark], not that Microtec made a false or injurious statement

6  about the quality of Green Hills′ compilers").

7

8        Here, Plaintiff provided two flyers Defendant used to advertise its "Killer

9  Tomato" as support for its trade libel claim.  (Doc. No. 186-2, at 32–34.)  At the

10  bottom of each flier, the following language appears: "Killer Tomatoes Trademark &

11  Copyrights are owned by W. Finletter Films, LLC.  Killer Tomatoes are used with

12  permission."  (Id.)  As discussed above, an infringement on another's trademark

13  rights does not qualify as a disparaging statement for the purposes of trade libel.

14  Hence, to the extent that Plaintiff claims that this statement infringes on Plaintiff's

15  trademark rights, the undisputed evidence shows there is no trade libel.

16  Alternatively, if Plaintiff is arguing that Defendant's statement disparages Plaintiff's

17  product, Plaintiff must show (1) the statement specifically refers to the Plaintiff's

18  product or business and (2) clearly derogates the product or business.  Plaintiff has

19  not provided sufficient evidence to meet either of these requirements.  First, there is

20  no indication Defendant's statement specifically referred to Plaintiff's "Killer

21  Tomato" products.  Both Defendant and Plaintiff were selling "Killer Tomatoes,"

22  and the statement is on Defendant's flyer advertising Defendant's "Killer

23  Tomatoes," so the natural assumption is that the statement refers to only

24  Defendant's product.  Also, the statement makes no reference to Plaintiff.  Second,

25  there is no evidence the statement "clearly derogates" Plaintiffs' product or

26  business.  The statement only asserts Defendant has received permission from W.

Finletter Films, LLC to use its trademark.  Notably, the flyers do not say Defendant has exclusive permission to use the trademark.  The statement's wording leaves open the possibility other companies, including Plaintiff, also have permission to use the trademark.  Further, the flyers do not state the trademark is necessary to use the term "Killer Tomato" in connection with naval targets.  Thus, the undisputed facts show that the statement neither (1) specifically refers to Plaintiff's product or business (2) nor clearly derogates Plaintiff's product or business, so Plaintiff does not have a viable trade libel claim.

Accordingly, the Court GRANTS Defendant's motion for summary judgment as it relates to Plaintiff's second claim for relief (Trade Libel).

## H.   Defendant's Affirmative Motion for Summary Judgment on its Counterclaims

In addition to moving for summary judgment on Plaintiff's claims, Defendant also affirmatively moved for summary judgment on its counterclaims for (1) defamation, (2) tortious interference with prospective economic advantage, and (3) trade libel.  The Court addresses each in turn.

### 1.   Defamation Claims

Defendant claims Plaintiff defamed Defendant by making false statements in emails to customers, potential customers, and other third parties.  (Doc. No. 156-1 at 23–24.)  Plaintiff disputes these statements were false and also asserts Plaintiff at least believed them to be true when they were made.  (Doc. No. 180 at 33–34.)

United States District Court
Central District of California

To state a claim for defamation under California law, "a plaintiff must establish 'the intentional publication of a statement of fact that is false, unprivileged, and has a natural tendency to injure or which causes special damage.'" Holomaxx Techs. v. Microsoft Corp., 783 F. Supp. 2d 1097, 1107 (N.D. Cal. 2011) (citations omitted); Wong v. Jing , 189 Cal. App. 4th 1354, 1369 (2010) ("The elements of a defamation claim are (1) a publication that is (2) false, (3) defamatory, (4) unprivileged, and (5) has a natural tendency to injure or cause special damage."). "'The sine qua non of recovery for defamation . . . is the existence of falsehood.'" McGarry v. Univ. of San Diego, 154 Cal. App. 4th 97, 112 (2007) (quoting Letter Carriers v. Austin , 418 U.S. 264, 283 (1974)).  "A private figure only needs to prove that a defendant acted negligently in publishing false information about the individual."  Carafano v. Metrosplash.com Inc., 207 F. Supp. 2d 1055, 1070 (C.D. Cal. 2002), aff'd on other grounds, 339 F.3d 1119 (9th Cir. 2003) holding modified by Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC, 521 F.3d 1157 (9th Cir. 2008).  "In defamation actions generally, factual truth is a defense which it is the defendant's burden to prove."  Eisenberg v. Alameda Newspapers, Inc., 74 Cal. App. 4th 1359, 1382 (1999).

Here, Defendant has alleged the following statements were false:

    a) [Defendant] is "NOT AUTHORIZED" to make or deliver the Killer Tomato targets and that [Defendant] was terminated for cause for "multiple cases of fraud." (UMF#23).

b) [Defendant] was "given an order to 'Cease and Desist' all activities . . ." and that [Defendant] was issued a "Cease & Desist" order due to multiple acts of fraud. (UMF#24).

c) [Defendant] was selling inferior products. (UMF##26, 42).

d) [Defendant] was engaged in the sale and distribution of "counterfeit" products. (UMF#36, 37).

e) [Plaintiff] was the "sole source manufacturer" of "Killer Tomato" naval gunnery targets. (UMF# 36).

f) Procurement of Defendant's products "empowered criminal activity" and "empowered THEFT and COUNTERFEITING." (Doc. No. 157-5 at 98; UMF 36, 37.)

g) Defendant's marketing of its products under Plaintiff's NSN "is subject to criminal penalties and civil remedies under US Code." (Doc. No. 157-5 at 109; UMF 57.)

(Doc. No. 156-1 at 23–24.)

The Court addresses each of these statements as follows:

a) *Statements A and B: "[Defendant] is 'NOT AUTHORIZED' to make or deliver the Killer Tomato targets and that [Defendant] was terminated*

> *for cause for 'multiple cases of fraud' . . . . [Defendant] was 'given an*
> *order to 'Cease and Desist' all activities . . .' and that [Defendant] was*
> *issued a 'Cease & Desist' order due to multiple acts of fraud."*

In both statements, Defendant is referring to a March 14, 2013 email from Plaintiff's CEO Bruce Jackim to Tara Dean of the U.S. Navy that states:

> Be Advised, [Defendant] (aka Sterling Sleep) is NOT AUTHORIZED to make or deliver our trademarked proprietary design Killer Tomato$^{TM}$ NavTGTs. Legal action by [Plaintiff] against [Defendant] is in process. [Defendant] was the former company contracted to fabricate our NavTGT products.  They were terminated for cause 23 July 2012 upon discovery of multiple cases of fraud by them against our company. At that time they were given an Order to "Cease and Desist" all activities pertaining to our NavTGT products.  We shall attempt to provide an injunction against their activities with Fleet Logistics and other Naval customers as soon as possible.

(Doc. No. 156-1 at 23–24; Doc. No. 157-5 at 92.)

Defendant alleges this statement was false because, "[t]here has never been a court order, decision, finding or judgment that [Defendant] was ordered to cease and desist manufacturing and selling its product, to stop using the 'Killer Tomato' trade name or committed fraud or any other crime."  Plaintiff has shown there are genuine issues of material fact regarding whether these statements are true.  The deposition testimony of Bruce Jackim states he ordered Defendant to "cease and desist" using what was allegedly Plaintiff's "Killer Tomato" trademark.  (Doc. No. 157-5 at 93.)

Further, Jackim testified he "did not authorize [Defendant] to deliver [Plaintiff's] killer tomato naval gunnery targets." (Id. at 92.)  There is no indication Jackim was referring solely to a "court order, decision, finding or judgment."  This interpretation is further supported by the next sentence, in which Jackim states, "[w]e shall attempt to provide an injunction against [Defendant's] activities with Fleet Logistics and other naval customers as soon as possible."  This supports the inference Jackim was not stating that he had a "court order, decision, finding or judgment" because, if he did, he would not need to "attempt to provide an injunction."  Additionally, although Jackim uses the word "fraud," there is no indication he is specifically referring to the crime of fraud.  Further, as discussed above, genuine issues of material fact remain as to whether Plaintiff owned the rights to the "Killer Tomato" trademark.  If it is found Plaintiff owned the trademark, and Defendant was using it without permission, Defendant's conduct would be fraudulent, and Plaintiff's statement would be true.

Thus, genuine issues of material fact remain as to whether Plaintiff's statements were true.  Accordingly, the Court DENIES Defendant's summary judgment motion as to these statements.

    *b) Statement C: [Defendant] was selling inferior products.*

Here, Defendant is referring to a statement made in a March 14, 2013 email from Bruce Jackim, Plaintiff's CEO, to Lieutenant Kendrick Garrett, of the U.S. Navy. (Doc. No. 157-5 at 91.) In pertinent part, the email states, "[Defendant] is NOT authorized to make or sell our NavTGT products. Indeed, what ever they may deliver is substantially inferior to our products. We are preparing appropriate legal action against the company for theft, conversion and other breaches." (Id.)

United States District Court
Central District of California

Plaintiff has submitted considerable information describing the upgrades that it made to the "Killer Tomato" after Plaintiff terminated its business relationship with Defendant.  (Doc. No. 180-7 ¶ 48.)  Thus, genuine issues of material fact remain as to whether Defendant's products were "substantially inferior" to Plaintiff's at the time Jackim sent the email. Accordingly, the Court DENIES Defendant's summary judgment motion as to this statement.

      c)  *Statement D and E: "[Defendant] was engaged in the sale and distribution of 'counterfeit' products" and "[Plaintiff] was the 'sole source manufacturer' of 'Killer Tomato' naval gunnery targets.*

These statements are included in a series of emails from September to October 2013 between Bruce Jackim, Plaintiff's CEO, and Claire Murphy, a Lieutenant in the Irish Navy.  (Doc. No. 157-5 at 98–99.)  As discussed above, genuine issues of material fact remain regarding whether Plaintiff owned the rights to the "Killer Tomato" trademark.  If it is found that Plaintiff owned the trademark, and Defendant was using it without permission, Defendant's products could be described as "counterfeit," and Plaintiff's statement would be true.  Further, if Plaintiff owned the trademark and never gave Defendant permission to use it, Plaintiff would be the "sole source manufacturer," and Plaintiff's statement would be true.  Accordingly, the Court DENIES Defendant's summary judgment motion as to these statements.

      d)  *Statements F and G: "Procurement of Defendant's products 'empowered criminal activity' and 'empowered THEFT and COUNTERFEITING,'" and  "Defendant's marketing of its products*

41

United States District Court
Central District of California

*under Plaintiff's NSN 'is subject to criminal penalties and civil remedies under US Code.'*"

Here, Defendant is referring to an email Bruce Jackim wrote to the Irish Navy on September 27, 2013, stating the Irish Navy was "empower[ing] criminal activity" and "empower[ing] THEFT and COUNTERFEITING of our products," by buying Defendant's balloons.  (Doc. No. 157-5 at 98; UMF 36, 37.)  Defendant is also referring to a January 6, 2016 email Bruce Jackim wrote to Defense Logistics Agency, in which he stated Plaintiff "cannot abide [Defendant] to be allowed to provide non-equivalent, unauthorized, 'not exact product' under the NSN 6920-01-629-0823 for which [Plaintiff] is the registered sole source manufacturer. [Defendant's] alternate product is an unauthorized substitution for which [Defendant] is subject to criminal penalties and civil remedies under US Code." (Doc. No. 157-5 at 109; UMF 57.)

As discussed above, genuine issues of material fact remain regarding whether Plaintiff owned the rights to the "Killer Tomato" trademark.  If Plaintiff is found to own the trademark, and Defendant was using it without permission and supplying it under Plaintiff's NSN, Defendant's products could be described as "counterfeit," and Defendant's actions could be described as "THEFT."  Both "counterfeit[ing]" and "theft" are subject to criminal and civil penalties.  Thus, if Plaintiff is found to own the trademark, these statements could be true.  Accordingly, genuine issues of material fact remain as to the truth of Plaintiff's statements, and the Court DENIES Defendant's summary judgment motion as to these statements.

### 2.    Tortious Interference with Prospective Economic Advantage

Defendant alleges Plaintiff tortiously interfered with Defendant's economic relationship with Fleet Logistics, the Defense Logistics Agency, the Irish Navy, and the U.S. Navy.  (Doc. No. 156-1 at 25.)

> The elements of a claim for intentional interference with prospective economic advantage are 1) an economic relationship between the plaintiff and third party containing the probability of future economic benefit to the plaintiff, 2) knowledge by the defendant of the existence of the relationship, 3) intentional acts on the part of the defendant designed to disrupt the relationship, 4) actual disruption of the relationship, and 5) damages to the plaintiff proximately caused by the acts of the defendant."

Ingrid & Isabel, LLC, 70 F. Supp. 3d at 1120 (citing Visto Corp. v. Sproqit Techs., Inc., 360 F. Supp. 2d 1064, 1066 (N.D. Cal. 2005); Della Penna v. Toyota Motor Sales USA, Inc., 11 Cal. 4th 376, 389 (1995)).

Here, Defendant has offered no facts to show Plaintiff's actions proximately caused Defendant damage.  In support of Defendant's causation argument, the only evidence produced is a declaration stating Defendant's annual sales declined.  (Doc. No. 156-4 at 1–2.)  Further, although Defendant alleges that "DLA suspended its order" as a result of Plaintiff's emails, Plaintiff has supplied documents showing that Defendant was eventually awarded that very same DLA order.  (Doc. No. 186-3 at 17.)  Thus, the Court finds a reasonable jury could determine something other than Plaintiff's conduct proximately caused Defendant's decrease in sales.

United States District Court
Central District of California

Accordingly, the Court DENIES Defendant's motion for summary judgment on its claim for tortious interference with prospective economic advantage.

### 3.   Trade Libel Claims

Defendant also asserts trade libel claims based on the same facts it alleged in its claims for defamation and tortious interference with prospective economic advantage. (Doc. No. 156-1 at 26.)

"Under California law, 'trade libel is an intentional disparagement of the quality of property, which results in pecuniary damage.'" New.Net, Inc. v. Lavasoft, 356 F. Supp. 2d 1090, 1113 (C.D. Cal. 2004) (quoting Films of Distinction, Inc. v. Allegro Film Prod., Inc., 12 F. Supp. 2d 1068, 1081 (C.D. Cal. 1998)). "To prove trade libel, Plaintiff must show (1) a statement that (2) was false, (3) disparaging, (4) published to others in writing, (5) [that] induced others not to deal with it, and (6) caused special damages." Id. (citing Atl. Mut. Ins. Co. v. J. Lamb. Inc., 100 Cal. App. 4th 1017, 1035 (2002)).

As discussed above, Defendant has failed to show sufficient facts to show Plaintiff's actions proximately caused Defendant damages. Thus, the Court DENIES Defendant's motion for summary judgment as it relates to its trade-libel claim.

### 4.   Litigation Privilege

Plaintiff claims California's litigation privilege provides absolute immunity for its statements. (Doc. No. 180 at 38.) Defendant argues the litigation privilege

does not apply because (1) the statements were not in a judicial or quasi-judicial proceeding, (2) the statements "of criminal conduct and of inferior products bear no relation" to the contemplated legal action, (3) the contemplated litigation was not imminent, and (4) the litigation privilege "does not apply to tortious conduct." (Doc. No. 194 at 16–17.)

> California has a very broad "litigation privilege"; which provides absolute immunity for almost any statement made "in any . . . . official proceeding authorized by law," as against any tort except for malicious prosecution. Cal. Civ. Code § 47(2). . . . All that is required is that the communication be "(1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) . . . have some connection or logical relation to the action." Silberg v. Anderson, 50 Cal. 3d 205, 266 Cal. Rptr. 638, 786 P.2d 365, 368–69 (1990). A federal administrative hearing counts as a "quasi-judicial proceeding" if: "the administrative body is vested with discretion based upon investigation and consideration of evidentiary facts", that body may "hold hearings and decide the issue by the application of rules of law"; and that body has the power to affect "the personal or property rights of private persons." Tiedemann, 148 Cal. Rptr. at 247 (internal quotation marks omitted).

Mirmehdi v. United States, 689 F.3d 975, 985 (9th Cir. 2012).

When applied to pre-litigation communications, the privilege attaches "at the point in time when litigation is no longer a mere possibility, but has instead ripened into a proposed proceeding that is actually contemplated in good faith and under serious consideration as a means of obtaining access to the courts for the purpose of resolving the dispute." Edwards v. Centex Real Estate Corp., 53 Cal. App. 4th 15, 36 (1997); Action Apartment Ass'n, Inc. v. City of Santa Monica, 41 Cal. 4th 1232, 1251, 163 P.3d 89, 102 (2007) ("A prelitigation communication is privileged only when it relates to litigation that is contemplated in good faith and under serious consideration."). Whether a prelitigation communication relates to litigation that is contemplated in good faith and under serious consideration is an issue of fact. Action Apartment Ass'n, Inc. v. City of Santa Monica, 41 Cal. 4th 1232, 1251 (2007).

Although the temporal proximity of the communication and eventual lawsuit is a factor to consider, "litigation privilege is not conditioned upon an 'imminency' requirement separate from the requirement that prelitigation statements be made in serious and good faith consideration of litigation." Aronson v. Kinsella, 58 Cal. App. 4th 254, 268 (1997). For example, in Knoell v. Petrovich, 76 Cal. App. 4th 164 (1999), a landowner's lawyer sent a demand letter seeking to extinguish an easement, and the dispute was settled more than seven months later. Id. at 166–67. When the landowner's lawyer was sued for defamation, interference with prospective business advantage, and unfair business practices, the demand letter and all subsequent communications were absolutely privileged by the litigation privilege, and thus the "immanency" requirement was met, even though the letter was sent seven months before the settlement and no lawsuit was filed.

United States District Court
Central District of California

"Any doubt as to whether the privilege applies is resolved in favor of applying it." <u>Tom Jones Enterprises, Ltd. v. County of Los Angeles</u>, 212 Cal. App. 4th 1283, 1294 (2013).

Here, genuine issues of material fact remain as to whether all Plaintiff's statements addressed above are protected by California's litigation privilege.  On July 23, 2012, in an email titled "Termination of Services/Cease & Desist," Bruce Jackim stated to Defendant, "[s]hould your website continue to display any reference to 'Killer Tomato' or 'tomato type' or any other 'tomato' reference regarding any Naval Gunnery Targets, beyond the three (3) day deadline referenced, you shall be sued.  Should you fail to comply with instructions submitted, you shall be sued.  Should [Defendant] interfere in any fashion with the lawful business of [Plaintiff], its proprietary information, its registrations with federal procurement agencies, or attempt to use our trademarked name Killer Tomato$^{TM}$, or any other trademark name or proprietary business information belonging to [Plaintiff,] [Defendant] and persons involved shall be sued."  (Doc. No. 186-11 at 21.)  Thus, it is clear that at least since July 23, 2012, Plaintiff was making at least some communications "in serious and good faith consideration of litigation." The earliest statements Defendant contends are actionable occurred on March 14, 2013, well after Plaintiff sent the July 23, 2012 letter threatening litigation.  (Doc. No. 156-1 at 23–24; Doc. No. 157-5 at 92.)  Plaintiff's action before the Trademark Trial and Appeal Board was brought on November 15, 2013 (Doc. No. 156-4 at 4.)  The litigation privilege applies to Trademark Trial and Appeal Board proceedings because it "'is vested with discretion based upon investigation and consideration of evidentiary facts', . . . may 'hold hearings and decide the issue by the application of rules of law'; and . . . has the power to affect 'the personal or

property rights of private persons.'" <u>Tiedemann</u>, 148 Cal. Rptr. at 247.  Further, exhibits submitted by both parties in this action show both Plaintiff and Defendant had a tenuous relationship from 2013 onward.  Thus, due to the July 23, 2012 demand letter, the subsequent Trademark Trial and Appeal Board proceeding, and the instant action, a reasonable jury could find both Plaintiff's and Defendant's communications from 2013 onward were "in serious and good faith consideration of litigation."

Further, all Plaintiff's statements that Defendant contends are actionable have "some connection or logical relation to the action" and were made "to achieve the objects of the litigation." <u>Silberg</u>, 50 Cal. 3d at 266.  Plaintiff is attempting to prevent Defendant from using what Plaintiff contends are its exclusive rights to the trademark "Killer Tomato" and protect the trade-secret rights Plaintiff contends it has to its product design and customer list.  Plaintiff's statements "of criminal conduct and of inferior products" were all made to either the U.S. Navy or Irish Navy to inform them of what Plaintiff alleges was Defendant's illicit conduct, which Plaintiff sought to prevent.  (Doc. No. 194 at 16.)  Thus, these statements have at least some "connection or logical relation to the action" and were made "to achieve the objects of [this] litigation." <u>Id.</u>[3]

---

[3] Defendant contends the litigation privilege should not apply because "Section 47(b) does not apply to tortious conduct."  (Doc. No. 194 at 17.)  In support of this proposition, Defendant cites <u>LiMandri v. Judkins</u>, 52 Cal. App. 4th 326 (1997).  A close reading of <u>LiMandri</u>, however, reveals its reasoning supports applying the litigation privilege to Plaintiff's statements.  In, <u>LiMandri</u>, the "gravamen of [the plaintiff's] interference cause of action [was] that [the defendant], with knowledge of [the plaintiff's] superior contractual lien rights in . . . settlement proceeds, created a security interest in those proceeds on behalf of [the defendant's client] and asserted it as superior to [plaintiff's] contractual lien." <u>Id.</u> at 341.  Thus, the litigation privilege did not apply because the preparation of the security interest was not

United States District Court
Central District of California

Accordingly, the Court finds genuine issues of material facts remain regarding whether Plaintiff's statements are protected by the litigation privilege.

## V.    CONCLUSION

For the reasons stated above, the Court DENIES Defendant's motion for summary judgment as it relates to Plaintiff's:

- first claim for relief (false advertising under Lanham Act § 43(a));
- third claim for relief (declaratory judgment);
- fourth claim for relief (unfair competition under Lanham Act § 43(a), 15 U.S.C. § 1125(a));
- sixth claim for relief (intentional interference with prospective economic advantage);
- seventh claim for relief (unfair competition under California Business and Professions Code section 17200) but only as to Defendant's alleged unlawful use of the trademark;
- tenth claim for relief (federal trademark infringement); and
- eleventh claim for relief (common law trademark infringement).

---

a "communicative act," and the litigation privilege "applies only to communicative acts and does not privilege tortious courses of conduct." Id. at 345. LiMandri, however, ruled the litigation privilege protected the "filing [of the] notice of lien" because such an act was "communicative." Id. Here, all Defendant's claims are based on Plaintiff's statements, often to third parties, which are much more "communicative" than filing a notice of lien, which was protected in LiMandri. Thus, even under LiMandri's reasoning, Plaintiff's statements would be protected by the litigation privilege.

The Court GRANTS Defendant's motion for summary judgment as it relates to Plaintiff's:

- second claim for relief (trade libel);
- fifth claim for relief (misappropriation of trade secrets regarding Plaintiff's customer list, "Killer Tomato" skirt, and RADAR reflective material);
- seventh claim for relief (unfair competition under California Business and Professions Code section 17200) but only as to Defendant's alleged unlawful use of Plaintiff's trade secrets;
- eighth claim for relief (breach of contract); and
- twelfth claim for relief (fraud, fraudulent inducement, fraudulent concealment and fraudulent representations).

Further, the Court DENIES, in its entirety, Defendant's affirmative motion for summary judgment.

**IT IS SO ORDERED.**

Dated:    10/19/16

Virginia A. Phillips
Chief United States District Judge

United States District Court
Central District of California

50